[No. B215096. Second Dist., Div. Seven. Sept. 3, 2010.]

SANDRA CORRALES FAVILA, as Executor, etc., Plaintiff and Appellant, v. KATTEN MUCHIN ROSENMAN LLP et al., Defendants and Respondents.

[No. B216822. Second Dist., Div. Seven. Sept. 3, 2010.]

SANDRA CORRALES FAVILA, as Executor, etc., Plaintiff and Appellant, v. KATTEN MUCHIN ROSENMAN LLP et al., Defendants and Respondents.

**COUNSEL**

Sands & Associates, Leonard S. Sands, Heleni E. Suydam, Diallo K. Scott; James K. Cameron & Associates and James K. Cameron for Plaintiff and Appellant.

Katten Muchin Rosenman, Daniel A. Platt and Gloria C. Franke for Defendants and Respondents.

**OPINION**

**PERLUSS, P. J.**—The assets of Motion Graphix, Inc., were sold to Get Flipped, Inc., after the death of Motion Graphix's founder and shareholder, Richard Corrales. The estate of Richard Corrales (Estate) through its executor, Sandra Corrales Favila, Corrales's sister, sued Get Flipped and its founder, Raleigh Souther, who was Motion Graphix's only other shareholder, for claims including conversion, breach of fiduciary duty and fraud (the individual action). The Estate appeals from the trial court's order denying its petition and motion for leave to amend the complaint in the individual action to allege a conspiracy claim against Motion Graphix's corporate counsel, Katten Muchin Rosenman LLP (Katten Muchin), and two attorneys at the Katten Muchin firm, Gavin Galimi and James Thompson (collectively attorneys).

The Estate also filed a separate derivative action against the attorneys, Souther and Get Flipped on behalf of Motion Graphix asserting claims for professional negligence, breach of fiduciary duty and unjust enrichment arising from the asset sale transaction (the derivative action). That action was dismissed as to the attorneys after the trial court sustained their demurrer and the Estate elected not to amend its complaint. The Estate appeals from that order, as well.

We reverse the order denying the Estate's petition and motion in the individual action and remand with direction to permit the Estate to file a revised first amended complaint, alleging a cause of action against the attorneys for conspiracy to commit fraud. We reverse the order dismissing the derivative action as to the attorneys and remand with directions to redetermine whether the lawyer-client privilege prevents the attorneys from meaningfully defending the action or whether, because of the crime-fraud exception or waiver by the privilege holder, the privilege is no bar to the derivative action.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. *The Sale of Motion Graphix's Assets to Get Flipped*

In February 2000 Corrales, an inventor, organized and incorporated Motion Graphix to license and sell photographic and imaging technologies he had developed or improved. In May 2000 the company issued 51 percent of its 1,000 shares of common stock to Corrales (510 shares) and 49 percent (490 shares) to Souther, and the board of directors approved bylaws requiring the approval of a majority of the shares represented and voting to validate an action taken by the company unless a greater number was required by law.[1] In 2001 Corrales assigned to Motion Graphix his rights in two pending patents. In August 2004 Katten Muchin began representing Motion Graphix.

In early August 2005, following a dispute between Corrales and Souther over Corrales's right to engage in personal business uses of Motion Graphix software codes, Corrales agreed to sell 80 percent of his shares in Motion Graphix to the company and resign from his positions as director and officer. Corrales, on behalf of himself, and Souther, on behalf of himself and as chief

---

[1] Section 8 of the bylaws states in part, "If a quorum is present . . . , the affirmative vote of a majority of the shares represented and voting, provided such shares voting affirmatively also constitute a majority of the number of shares required for a quorum, shall be the act of the shareholders unless the vote of a greater number or voting by classes is required by law or by the articles of incorporation." Section 6 defines a quorum for the transaction of business as, "The presence in person or by proxy of the holders of a majority of the shares entitled to vote at any meeting of the shareholders . . . ."

executive officer of Motion Graphix, signed a ratification and release agreement drafted by Galimi that incorporated a term sheet providing, "[Corrales] will have access to the code 'iPhotoBooth' "; "[Corrales] will have any future contract with Eurolink & Lugovco & Kodak"; and "[Corrales] will receive 20% of gross profits after the first year, and still retain[] a silent 20% ownership."[2] The term sheet also stated, "Raleigh Souther becomes majority partner and shareholder for Motion Graphix when document is signed by both parties." The term sheet appears to have been prepared by Corrales or Souther, not by counsel.

On August 18, 2005 Corrales complained in an e-mail to Galimi that he had not been provided access to the full software code as promised and not received any explanation from Souther: "It has been a week since final papers were signed, and five days since my registered dispute over incomplete code made available. [Souther] has not answered repeated requests for [explanations] from myself and my client Eurolink that requires the requested code. [¶] Also, the question of code for the [K]odak contract has also not been addressed. [¶] Even as the stock exchanges ownership, my continued 20 percent share of the company should be respected and these questions need to be answered. [¶] I appeal to your duty to Motion Graphix to have [Souther] address these issues, and simply stonewalling is not acceptable." Galimi responded to Corrales, "As you correctly point out, I have a duty to Motion Graphix, as counsel to Motion Graphix, and not to you or [Souther] as individuals. I'm not in a position to address disputes between the two of you. That said, [Souther] has been out of town so he probably has not been accessing email. I don't believe he is stonewalling."

Corrales died in November 2005, and his shares in Motion Graphix passed to the Estate. On February 24, 2006 Souther sent an e-mail—the cornerstone of the Estate's complaint against the attorneys—to Galimi and Joan Green, an accountant, stating Get Flipped should be incorporated as soon as possible and acknowledging the possibility of a lawsuit by the Estate:

"Well, I'm sorry to get everyone's hope's [sic] up last night regarding Get Flipped's standing. Reviewing the documents, my mindset at the time was to keep Get Flipped under the MG umbrella until I could get control of the company, it is also using the same Fed tax id number . . . . Regrettably, my thinking also was liability for our event photography, our insurance policy was under the MG name. In my mind, however, the two we're [sic] entirely separate, but this doesn't do us much good at the moment.

---

[2] The term sheet stated Corrales would sell 410 shares of stock; a stock assignment certificate he signed on August 11, 2005 provides for the sale and transfer to Motion Graphix of 310 shares. Although the Estate contends the sale of stock was never completed, the parties do not dispute, whatever the correct number, Corrales intended to retain only a 20 percent interest in Motion Graphix.

"Also, I found the 2000 corporate tax return, and unfortunately we made more money than I thought, actually $156,000 for that year, so going back to the first year wouldn't work. If we took the actually first full year the company was in business, 2001 we only made $61,200 for that year but I'm sure that wouldn't fly.

"So, damn the torpedoes, let's incorporate Get Flipped™ Inc and sell the MG assets over and dissolve MG as quick as possible. As far as [Corrales's] estate wanting the 20% gross, gross of what we can say. I think if we can use Joan's [(the accountant's)] valuation for the shares at the time [Corrales] signed them over, we can offer that up as payment for his share after we dissolve the company.

"I realize this doesn't get me out of a possible personal lawsuit with the Corrales estate, but that nasty business can be dealt with after we dissolve the company. I think as a settlement incentive we'd need to have the Corrales estate be willing to take payment for the shares and agree to not sue by accepting payment. [¶] . . . [¶]

"I'll follow with a list of assets I want GF to purchase from M.G. Wish I had better news guys. Thanks very much for your efforts last night."

In March 2006 Souther incorporated Get Flipped. Souther was Get Flipped's sole shareholder, officer and director. On February 7, 2007 Souther, as president of Motion Graphix, sent the Estate a letter stating a majority of Motion Graphix's shareholders had voted to sell the company's assets to Get Flipped.[3] According to Souther, he did not receive a response or objection from the Estate; thus, on February 27, 2007 he executed a "Quitclaim Assignment" transferring Motion Graphix's assets to Get Flipped for $5,000. Souther testified at his deposition the $5,000 price was for hardware, and no value was placed on customers, product or software.[4] In a letter dated March 26, 2007 the Estate was informed "that the Board of Directors and the holders of a majority of the outstanding shares of Motion Graphix . . . have acted by

---

[3] The letter stated, "This letter is to provide you with notice that the holders of a majority of the outstanding shares of Motion Graphix, Inc., a California corporation (the 'Company') have acted by written consent pursuant to Section 603(a) of the California Corporations Code to (1) enter into a Quitclaim Assignment (the 'Assignment') by and between the Company, as Assignor, and Get Flipped, Inc., a California corporation, as Assignee, pursuant to which the Company will sell, transfer, convey, assign and quitclaim to Assignee all right, title and interest in and to 100% of the assets of Assignor as set forth therein (the 'Asset Sale'), and (2) take all other action necessary to consummate the Asset Sale. [¶] A copy of the shareholder written consent is enclosed."

[4] Souther has elsewhere explained Get Flipped had a free license in perpetuity for use of all Motion Graphix's intellectual property and, as a result, those intangible assets had no realizable market value.

written consent . . . to approve the wind up and dissolution of the Corporation." On April 20, 2007 Motion Graphix was dissolved. Katten Muchin represented Motion Graphix in connection with the sale. (Galimi had resigned from the firm in Nov. 2006 and was replaced by Thompson.) According to Souther, the law firm of Stradling Yocca Carlson & Rauth represented Get Flipped in the transaction.

### 2. *The Individual Action*

On October 30, 2007 the Estate filed a complaint asserting claims including conversion, breach of fiduciary duty, fraud and breach of contract against Souther, Get Flipped and fictitiously named Doe defendants. The complaint alleged Corrales still held 51 percent of the shares of Motion Graphix when he died, those shares passed to the Estate, the Estate never approved the sale of Motion Graphix's assets to Get Flipped or the company's dissolution, the fair market value of Motion Graphix's intellectual property ranged between $8 and $12 million and Souther engaged in wrongdoing, including violating the Corporations Code, by orchestrating the fraudulent and unauthorized sale of Motion Graphix's assets to Get Flipped for $5,000.[5]

On June 23, 2008 the Estate amended the complaint by substituting Galimi for one of the fictitiously named Doe defendants; on July 14, 2008 it filed another Doe amendment naming Katten Muchin.[6] Galimi demurred on July 28, 2008, primarily contending he had left Katten Muchin in November 2006, months before the allegedly fraudulent asset sale took place, and thus could not be liable. On August 13, 2008 Galimi moved for sanctions against the Estate and its attorneys, contending the claims against him were baseless and had been brought for an improper purpose (Code Civ. Proc., § 128.7, subd. (a)). On that same day, Katten Muchin also demurred, contending the complaint lacked any specific allegations against Galimi or the firm.

At a hearing on September 5, 2008 the trial court sustained both demurrers without leave to amend but without prejudice to the Estate filing a petition under Civil Code section 1714.10, subdivision (a),[7] which requires a court order before a plaintiff may file a complaint with a "cause of action against an attorney for a civil conspiracy with his or her client arising from any

---

[5] In May 2007 the Estate petitioned for court intervention and supervision of Motion Graphix's windup and made many of the same allegations of wrongdoing. The Estate dismissed the petition after Souther and the other defendants (Get Flipped and Souther's wife, Helena Pasquarella) moved for sanctions on the ground the petition lacked merit because Motion Graphix had already been voluntarily dissolved.

[6] In April 2008 the Estate had amended the complaint to name Souther's wife, Helena Pasquarella.

[7] Statutory references are to the Civil Code unless otherwise indicated.

attempt to contest or compromise a claim or dispute, and which is based upon the attorney's representation of the client . . . ." Although the initial complaint did not include a conspiracy claim, the court explained, "It is clear that [the Estate is] inferring that defendant acted as the attorney for Souther or Get Flipped at the time of the subject transaction and conspired with him, even though no conspiracy is alleged as a cause of action. And the requirements of [section] 1714.10 need to be fulfilled."

The sanctions motion was continued to permit the Estate's attorney to file a declaration in response to questioning by the court. On October 31, 2008 the trial court granted the motion, finding, "Attorney Galimi was copied on an email with two replies in 2/06. Attorney Galimi left [Katten Muchin] in 11/06 prior to the asset sale in 2/07. The complaint does not provide a basis for holding Attorney Galimi for conspiracy to do anything alleged in the complaint or any other theory of liability."

### 3. The Trial Court's Denial of the Petition and Motion for Leave to Amend the Complaint in the Individual Action

On September 23, 2008 the Estate filed a petition for an order allowing it to file a first amended complaint asserting a conspiracy claim against Galimi, Katten Muchin and, although not previously named, Thompson. The petition was denied without prejudice on October 17, 2008 because the Estate, apparently confused as to section 1714.10, subdivision (a)'s procedural requirements, had failed to serve the attorneys.

On December 17, 2008 the Estate again filed the petition and a separate, largely duplicative motion for leave to amend the first amended complaint. Notwithstanding the trial court's earlier orders only permitting the Estate to file a petition to amend the complaint to state a conspiracy claim, the proposed first amended complaint also sought to name the attorneys in causes of action for conversion, breach of fiduciary duty and fraud.

The proposed new pleading alleged, in essence, that Souther and Galimi formulated a scheme to defraud the Estate by incorporating Get Flipped and selling Motion Graphix's assets to it for a price grossly below market, as evidenced by the February 2006 e-mail from Souther to Galimi and the accountant. In furtherance of that fraudulent scheme the February 2007 letter to the Estate falsely stated a majority of shareholders had approved the sale. Contrary to that representation, the Estate, which did not approve the sale, was the majority shareholder even though Corrales and Souther had signed the ratification and release agreement because the stock transfer was never completed. As Galimi knew both from the August 18, 2005 e-mail he had received from Corrales and as Motion Graphix's counsel privy to its books

and records, Corrales had never received the software code or payment he was entitled to under the terms of the agreement. (No action for rescission or breach of the ratification agreement was ever filed, however.) The proposed complaint alternatively alleged, even if the stock transfer was effective and Corrales was only a 20 percent shareholder, the sale violated two provisions of the Corporations Code: Corporations Code section 1001, subdivision (d),[8] which requires the sale of all or substantially all of a company's assets be approved by 90 percent of the shares entitled to vote; and Corporations Code section 310, subdivision (a),[9] which prohibited Souther from voting to approve the asset sale because he had a material financial interest in the transaction. Thompson participated in the fraudulent scheme after Galimi left Katten Muchin by drafting the February 2007 letter allegedly knowing the Estate was still the majority shareholder or, at least, knowing of the purported Corporations Code violations.

On January 28, 2009 the trial court denied the petition and motion. The court ruled section 1714.10 was applicable and the Estate had not pleaded either of the exceptions to the statute—either "(1) the attorney has an

---

[8] Corporations Code section 1001, subdivision (d), states, "If the acquiring party in a transaction pursuant to subdivision (a) of this section or subdivision (g) of Section 2001 is in control of or under common control with the disposing corporation, the principal terms of the sale must be approved by at least 90 percent of the voting power of the disposing corporation unless the disposition is to a domestic or foreign corporation or other business entity in consideration of the nonredeemable common shares or nonredeemable equity securities of the acquiring party or its parent."

[9] Corporations Code section 310, subdivision (a), states, "(a) No contract or other transaction between a corporation and one or more of its directors, or between a corporation and any corporation, firm or association in which one or more of its directors has a material financial interest, is either void or voidable because such director or directors or such other corporation, firm or association are parties or because such director or directors are present at the meeting of the board or a committee thereof which authorizes, approves or ratifies the contract or transaction, if [¶] (1) The material facts as to the transaction and as to such director's interest are fully disclosed or known to the shareholders and such contract or transaction is approved by the shareholders (Section 153) in good faith, with the shares owned by the interested director or directors not being entitled to vote thereon, or [¶] (2) The material facts as to the transaction and as to such director's interest are fully disclosed or known to the board or committee, and the board or committee authorizes, approves or ratifies the contract or transaction in good faith by a vote sufficient without counting the vote of the interested director or directors and the contract or transaction is just and reasonable as to the corporation at the time it is authorized, approved or ratified, or [¶] (3) As to contracts or transactions not approved as provided in paragraph (1) or (2) of this subdivision, the person asserting the validity of the contract or transaction sustains the burden of proving that the contract or transaction was just and reasonable as to the corporation at the time it was authorized, approved or ratified. [¶] A mere common directorship does not constitute a material financial interest within the meaning of this subdivision. A director is not interested within the meaning of this subdivision in a resolution fixing the compensation of another director as a director, officer or employee of the corporation, notwithstanding the fact that the first director is also receiving compensation from the corporation."

independent legal duty to the plaintiff, or (2) the attorney's acts go beyond the performance of a professional duty to serve the client and involve a conspiracy to violate a legal duty in furtherance of the attorney's financial gain." (§ 1714.10, subd. (c).) The court explained, "[I]t would seem that the defendants would only have an independent legal duty to [Motion Graphix] and not the . . . Estate."

The court then found the Estate had not met its burden under section 1714.10 to establish a reasonable probability it would prevail in the action. The court stated, "Galimi no longer worked at the Katten firm at the time of the transactions disputed in the complaint. . . . The complaint does not provide a basis for holding Attorney Galimi for conspiracy to do anything alleged in the complaint or any other theory of liability." The court found Galimi's receipt of the February 2006 e-mail from Souther was insufficient to establish Galimi had participated in a conspiracy: "[J]ust by receiving an email you get sucked into a conspiracy and you can be sued for being in a conspiracy, I'm not sure that's the law in this state. . . . You know what. People cc lawyers with e-mails all the time." The court also found significant the August 18, 2005 e-mail Galimi had sent to Corrales stating Galimi had a duty to Motion Graphix as its counsel, not to Corrales or Souther as individuals.

With respect to Thompson the court stated, "[The Estate] contends that Thompson joined in the conspiracy on or about February '07, yet, plaintiff does not allege any conspiratorial conduct of Thompson, aside from the fact that the asset sale occurred that month. [The Estate's] allegations sound more like a professional negligence claim, not a conspiracy claim."

The court's order finding the section 1714.10, subdivision (c), exceptions inapplicable and denying the Estate's petition and motion to file its first amended complaint is immediately appealable pursuant to section 1714.10, subdivision (d).

### 4. The Derivative Action[10]

On October 3, 2008, while the Estate's petition for leave to file an amended complaint was pending in the individual action, the Estate filed a separate action against the attorneys, asserting causes of action for legal malpractice and breach of fiduciary duty arising out of their representation of Motion Graphix. The attorneys demurred on grounds including the lack of any duty to Corrales or the Estate. The Estate on December 29, 2008

---

[10] The request by the attorneys in the derivative action for judicial notice of documents in the record on appeal of the individual action is denied as unnecessary. The Estate's motion to strike those documents from the respondent's appendix in the derivative action is denied.

amended the complaint to allege a shareholder derivative action and added a claim for unjust enrichment. The derivative action also named Souther and Get Flipped and asserted claims against them including for breach of fiduciary duty, conversion and fraud.

On March 4, 2009 the trial court sustained the attorneys' demurrer to the derivative action with leave to amend, ruling the Estate lacked standing to bring a derivative action on behalf of a dissolved corporation under Corporations Code section 800, subdivision (b), which requires the shareholder to own stock during the pendency of the litigation. The court explained, "[Motion Graphix] is a dissolved corporation; thus, [the Estate] ceased being a shareholder when the dissolution occurred." Although Corporations Code section 2010, subdivision (a), provides a dissolved corporation continues to exist after dissolution for the purpose of winding up its affairs and prosecuting and defending actions against it, the court found that section "enables a dissolved corporation, not its shareholders, to prosecute actions against it. [The Estate] has not provided this court with any authority to the effect that Corporations Code, section 800 and 2010 together enable a shareholder of a dissolved corporation to bring a derivative suit."

The trial court further ruled, even if the Estate had standing, it was nevertheless precluded from pursuing the action against outside corporate counsel in the absence of a waiver of Motion Graphix's lawyer-client privilege. (See *McDermott, Will & Emery v. Superior Court* (2000) 83 Cal.App.4th 378, 381 [99 Cal.Rptr.2d 622] (*McDermott, Will*) [derivative legal malpractice action against outside corporate counsel not permitted; "in the absence of a waiver by the corporate client, the third party attorney is effectively foreclosed from mounting any meaningful defense . . ."].) The court rejected the Estate's contention the privilege ceased to exist upon Motion Graphix's dissolution or was lost by virtue of the crime-fraud exception based on its earlier ruling in the individual action denying the Estate's motion to compel Galimi and Souther to answer deposition questions after they had asserted the attorney-client privilege. The court explained it had already "determined that Get Flipped acquired substantially all of [Motion Graphix's] assets and, as such, it acquired [Motion Graphix's] attorney-client privilege" and that the Estate had "not shown the crime-fraud exception of Evidence Code [8]56 applies."

The Estate did not amend the complaint. On April 21, 2009, pursuant to the attorneys' ex parte application, the court dismissed the derivative action as to the attorneys. The Estate filed a timely notice of appeal.

# DISCUSSION

## *The Individual Action*

### 1. *Governing Law; Civil Conspiracy*

■ Civil conspiracy is not an independent tort. (See *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 511 [28 Cal.Rptr.2d 475, 869 P.2d 454].) "Standing alone, a conspiracy does no harm and engenders no tort liability. It must be activated by the commission of an actual tort." (*Ibid.*)

" 'The major significance of a conspiracy cause of action "lies in the fact that it renders each participant in the wrongful act responsible as a joint tortfeasor for all damages ensuing from the wrong . . . regardless of the degree of his activity. [Citations.]" ' [Citation.] The essence of the claim is that it is merely a mechanism for imposing vicarious liability; it is not itself a substantive basis for liability. Each member of the conspiracy becomes liable for all acts done by others pursuant to the conspiracy, and for all damages caused thereby." (*Berg & Berg Enterprises, LLC v. Sherwood Partners, Inc.* (2005) 131 Cal.App.4th 802, 823 [32 Cal.Rptr.3d 325] (*Berg*); see *Applied Equipment Corp. v. Litton Saudi Arabia Ltd., supra,* 7 Cal.4th at pp. 510–511 [conspiracy is "a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration"].)

" '[T]he basis of a civil conspiracy is the formation of a group of two or more persons who have agreed to a common plan or design to commit a tortious act.' [Citations.] The conspiring defendants must also have actual knowledge that a tort is planned and concur in the tortious scheme with knowledge of its unlawful purpose. [Citations.] [¶] However, actual knowledge of the planned tort, without more, is insufficient to serve as the basis for a conspiracy claim. Knowledge of the planned tort must be combined with intent to aid in its commission." (*Kidron v. Movie Acquisition Corp.* (1995) 40 Cal.App.4th 1571, 1582 [47 Cal.Rptr.2d 752].) Knowledge and intent " 'may be inferred from the nature of the acts done, the relation of the parties, the interest of the alleged conspirators, and other circumstances.' " (*Ibid.*)

"It is the settled rule that 'to render a person civilly liable for injuries resulting from a conspiracy of which he was a member, it is not necessary that he should have joined the conspiracy at the time of its inception; every one who enters into such a common design is in law a party to every act previously or subsequently done by any of the others in pursuance of it.' " (*de Vries v. Brumback* (1960) 53 Cal.2d 643, 648 [2 Cal.Rptr. 764, 349 P.2d 532].)

### 2. *Section 1714.10*

■ Section 1714.10 establishes special procedural requirements that must be satisfied before certain types of claims can be asserted against an attorney based on an alleged conspiracy between the attorney and his or her client.[11] The statute as it currently reads is the product of legislative reaction to several appellate decisions. A brief review of its development is helpful to an understanding of the statute's limited scope and proper application in this case.[12]

Section 1714.10 was originally enacted in 1988 in response to the Court of Appeal's decision in *Wolfrich Corp. v. United Services Automobile Assn.* (1983) 149 Cal.App.3d 1206 [197 Cal.Rptr. 446] (*Wolfrich*), which held, although an insurance company's attorneys could not be sued directly for violating Insurance Code section 790.03, they could be sued for conspiring with their client to commit unfair or deceptive acts or practices prohibited by the code. (*Wolfrich*, at p. 1211.) To prevent the assertion of conspiracy claims against attorneys "as a tactical ploy, particularly in actions against insurance companies" (*College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704, 718 [34 Cal.Rptr.2d 898, 882 P.2d 894]), former section 1714.10 required a prefiling judicial determination of probable merit for any claim against an attorney alleging the attorney had conspired with his or her client. (Stats. 1988, ch. 1052, § 1, pp. 3407–3408;[13] see *Pavicich v. Santucci* (2000) 85

---

[11] Section 1714.10, subdivision (a), provides, "No cause of action against an attorney for a civil conspiracy with his or her client arising from any attempt to contest or compromise a claim or dispute, and which is based upon the attorney's representation of the client, shall be included in a complaint or other pleading unless the court enters an order allowing the pleading that includes the claim for civil conspiracy to be filed after the court determines that the party seeking to file the pleading has established that there is a reasonable probability that the party will prevail in the action. The court may allow the filing of a pleading claiming liability based upon such a civil conspiracy following the filing of a verified petition therefor accompanied by the proposed pleading and supporting affidavits stating the facts upon which the liability is based. The court shall order service of the petition upon the party against whom the action is proposed to be filed and permit that party to submit opposing affidavits prior to making its determination. The filing of the petition, proposed pleading, and accompanying affidavits shall toll the running of any applicable statute of limitations until the final determination of the matter, which ruling, if favorable to the petitioning party, shall permit the proposed pleading to be filed."

[12] We review the trial court's interpretation of section 1714.10 de novo. (See *In re Tobacco II Cases* (2009) 46 Cal.4th 298, 311 [93 Cal.Rptr.3d 559, 207 P.3d 20]; *People ex rel. Lockyer v. Shamrock Foods Co.* (2000) 24 Cal.4th 415, 432 [101 Cal.Rptr.2d 200, 11 P.3d 956].)

[13] As originally enacted, former section 1714.10 provided in part, "No cause of action against an attorney based upon a civil conspiracy with his or her client shall be included in a complaint or other pleading unless the court enters an order allowing the pleading that includes a claim for civil conspiracy to be filed after the court determines that the party seeking to file the pleading has established that there is a reasonable probability that the party will prevail in the action. . . ." (Stats. 1988, ch. 1052, § 1, pp. 3407–3408.)

Cal.App.4th 382, 390–391 [102 Cal.Rptr.2d 125] (*Pavicich*).)[14] Enacted as part of the same legislation (Sen. Bill No. 2337 (1987–1988 Reg. Sess.)) that created the special motion to strike for cases arising from constitutionally protected petitioning and speech activity (Code Civ. Proc., § 425.16), the provisions were intended to " 'screen out meritless cases at an early stage' " by requiring the plaintiff to demonstrate a probability of success on the merits. (*College Hospital Inc.*, at p. 718.)[15]

In 1989, however, the Supreme Court in *Doctors' Co. v. Superior Court* (1989) 49 Cal.3d 39 [260 Cal.Rptr. 183, 775 P.2d 508] (*Doctors' Co.*) disapproved *Wolfrich*, holding no claim for conspiracy to violate the Insurance Code could be maintained against an attorney retained by an insurance company to assist in the defense of an insured against a third party claim. (*Id.* at p. 41.) The court relied on the doctrine, commonly referred to as the "agent's immunity rule," that "[a] cause of action for civil conspiracy may not arise . . . if the alleged conspirator, though a participant in the agreement underlying the injury, was not personally bound by the duty violated by the wrongdoing and was acting only as the agent or employee of the party who did have that duty." (*Id.* at p. 44.) The court held, "[b]ecause the noninsurer defendants are not subject to [the only statutory duty toward plaintiff claimed to have been breached] and were acting merely as agents of the insurer 'and not as individuals for their individual advantage' [citation], 'they cannot be held accountable on a theory of conspiracy.' " (*Id.* at p. 45.)

The court explained, however, "[i]t remains true, of course, that under *other* sets of circumstances '[attorneys] may be liable for participation in tortious acts with their clients, and such liability may rest on a conspiracy' [citations]. For example, an attorney who conspires to cause a client to violate a statutory duty peculiar to the client may be acting not only in the performance of a professional duty to serve the client but also in furtherance of the attorney's own financial gain." (*Doctors' Co., supra*, 49 Cal.3d at p. 46.) Additionally, a claim may lie "against an attorney for conspiring with his or her client to cause injury by violating the attorney's own duty to the plaintiff." (*Id.* at p. 47.)

Following the decision in *Doctors' Co.*, the Legislature debated whether the need for section 1714.10 had been eliminated. (See Sen. Com. on

[14] The Legislature expressly declared its intent "in enacting this measure to modify the decision of the Court of Appeal in *Wolfrich*." (Stats. 1988, ch. 1052, § 2, p. 3408.)

[15] " '[T]he motion required by such statutes [as section 1714.10] operates like a demurrer or motion for summary judgment in "reverse." Rather than requiring the defendant to defeat the plaintiff's pleading by showing it is legally or factually meritless, the motion requires the plaintiff to demonstrate that he possesses a legally sufficient claim which is "substantiated," that is, supported by competent, admissible evidence.' " (*Shafer v. Berger, Kahn, Shafton, Moss, Figler, Simon & Gladstone* (2003) 107 Cal.App.4th 54, 83 [131 Cal.Rptr.2d 777].)

Judiciary, com. on Sen. Bill No. 820 (1991–1992 Reg. Sess.) May 7, 1991, p. 4 ["[i]t is unknown whether there is a need for pleading hurdles to protect attorneys from the type of civil conspiracy claims permitted under the *Doctors' Company* rational[e]"]; *Pavicich, supra*, 85 Cal.App.4th at p. 393.) Ultimately, the statute was amended in 1991 to apply only to situations in which it was alleged an attorney had engaged in a conspiracy with his or her client "arising from any attempt to contest or compromise a claim"[16] (Stats. 1991, ch. 916, § 1, p. 4108) and to create, in a new subdivision (c), exceptions from the procedural requirements of section 1714.10 for the two situations described in *Doctors' Co.*: "where (1) the attorney has an independent legal duty to the plaintiff, or (2) the attorney's acts go beyond the performance of a professional duty to serve the client and involve a conspiracy to violate a legal duty in furtherance of the attorney's financial gain." (See generally *Pavicich, supra*, 85 Cal.App.4th at pp. 393–394 [discussing legislative history of 1991 amendment to § 1714.10].)

■ As the phrase is used in section 1714.10, subdivision (c), an attorney's "independent legal duty to the plaintiff" includes the "duty to abstain from injuring the plaintiff through express misrepresentation." (*Doctors' Co., supra*, 49 Cal.3d at p. 48 [describing *Younan v. Equifax Inc.* (1980) 111 Cal.App.3d 498 [169 Cal.Rptr. 478] in which "agents were held subject to liability for conspiracy to commit *actual* fraud . . ."]; see *Pavicich, supra*, 85 Cal.App.4th at p. 397 [plaintiff permitted to sue attorney for conspiring with client because attorney had a duty to plaintiff to not commit fraud]; *Shafer v. Berger, Kahn, Shafton, Moss, Figler, Simon & Gladstone, supra*, 107 Cal.App.4th at p. 84 [plaintiffs permitted to sue attorney for conspiring with insurance company to commit actual fraud because attorney "had a duty to refrain from injuring [plaintiffs] through express misrepresentation"].)

■ The net effect of the agent's immunity rule as articulated in *Doctors' Co., supra*, 49 Cal.3d 39, and the statutory exceptions to the section 1714.10 procedural requirements now contained in subdivision (c) is to render that section practically meaningless. If the plaintiff seeks to assert a conspiracy claim against an attorney based on the violation of a duty owed by the client, but not the attorney, and the attorney was acting within the scope of his or her professional responsibilities, the claim has no merit. The petition under section 1714.10 will be denied; but, in the absence of the statute, a demurrer would properly be sustained without leave to amend. Section 1714.10, at best, provides the attorney with only an additional procedural safeguard against meritless claims. If the plaintiff seeks to plead a conspiracy claim against an attorney based on fraud or virtually any other common law tort theory, the

---

[16] This phrase suggests section 1714.10, subdivision (a)'s pleading hurdle applies only to situations in which the alleged conspiracy arose from the attorney's representation of his or her client in a previous or current legal dispute or litigation with the plaintiff.

claim falls within section 1714.10, subdivision (c)(1); the procedural requirements of section 1714.10, subdivision (a), do not apply (that is, the plaintiff need not demonstrate a probability of prevailing on the merits); and the statute serves no screening function whatsoever. Similarly, even if the duty allegedly breached is one owed by the client but not the attorney (for example, the client has a fiduciary duty to the plaintiff), if the plaintiff alleges facts (or provides a factual description in the petition for leave to file the complaint) sufficient to negate the agent immunity rule at the pleading stage (by averring the attorney was acting outside his professional capacity and for his own personal gain), section 1714.10, subdivision (c)(2), excepts the pleading from subdivision (a)'s evidentiary requirements; and the statute again does not allow any preliminary evaluation of the merits of the case. (See *Panoutsopoulos v. Chambliss* (2007) 157 Cal.App.4th 297, 304 [68 Cal.Rptr.3d 647] ["the exceptions in section 1714.10, subdivision (c) have the effect of exempting any viable attorney-client claims from section 1714.10's requirements"]; *Pavicich, supra*, 85 Cal.App.4th at p. 395 ["[W]hen an attorney is acting in his or her official capacity, there are only the situations articulated in *Doctors' Co.*, in which an attorney could be liable for conspiring with his or her client. Of course, these situations are specifically excepted from section 1714.10's scope."]; *Berg, supra*, 131 Cal.App.4th at p. 818 [§ 1714.10's "gatekeeping function applies only to attorney-client conspiracy claims that are not viable as a matter of law in any event"].)

### 3. *The Trial Court Erred in Denying the Estate Leave to Amend the Complaint to Allege a Conspiracy Claim*

■ Under *Doctors' Co., supra*, 49 Cal.3d 39 an attorney has "an independent legal duty" not to defraud individuals engaged in business transactions with his or her client. Accordingly, because the Estate sought leave to amend to plead a conspiracy claim against Katten Muchin, Galimi and Thompson based on Souther's alleged fraudulent scheme to transfer Motion Graphix's assets to Get Flipped for a grossly undervalued price, the trial court erred in concluding the subdivision (c)(1) exception to section 1714.10 did not apply, and in requiring the Estate to establish a probability of prevailing on its conspiracy claim before allowing it to file its first amended complaint.[17]

■ Nonetheless, even if the proposed pleading falls within one of the subdivision (c) exceptions, in ruling on a section 1714.10 petition to allow

---

[17] When its initial complaint was challenged by Katten Muchin and Galimi, the Estate did not argue its claims were excepted from the requirements of section 1714.10, subdivision (a), by subdivision (c)(1). Rather, it asserted the lawyers were not conspiring with their client, Motion Graphix, but with Souther in his individual capacity and, for that reason, section 1714.10 did not apply to its claim. The trial court's ruling on the demurrer is not before us in this appeal.

the filing of a complaint based on a conspiracy between an attorney and his or her client, the court properly denies the petition if the pleading on its face fails to state a viable cause of action against the attorney and the deficiency cannot be remedied by amendment. The court, in effect, is in the same position as it would be in ruling on a demurrer and in deciding whether, after sustaining a demurrer, leave to amend the complaint should be allowed.

■ The applicable standards are familiar: " 'Where the complaint is defective, "[i]n the furtherance of justice great liberality should be exercised in permitting a plaintiff to amend his [or her] complaint . . . ." ' " (*Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 970–971 [9 Cal.Rptr.2d 92, 831 P.2d 317].) However, if the plaintiff's cause of action is not viable, leave to amend should not be granted if there is no basis for the court to conclude further amendment would cure the defects. (*Martorana v. Marlin & Saltzman* (2009) 175 Cal.App.4th 685, 697–698 [96 Cal.Rptr.3d 172]; *Vaillette v. Fireman's Fund Ins. Co.* (1993) 18 Cal.App.4th 680, 685 [22 Cal.Rptr.2d 807] ["leave to amend should *not* be granted where . . . amendment would be futile"]; see also *Schifando v. City of Los Angeles* (2003) 31 Cal.4th 1074, 1081 [6 Cal.Rptr.3d 457, 79 P.3d 569] [leave to amend should be granted only when the plaintiff has demonstrated a "reasonable possibility" that he or she can amend any of her claims to state viable causes of action].) Here, because fraud was the object of the conspiracy alleged by the Estate, the claim must be pleaded with specificity. (See *Lazar v. Superior Court* (1996) 12 Cal.4th 631, 645 [49 Cal.Rptr.2d 377, 909 P.2d 981] [" 'particularity requirement necessitates pleading *facts* which "show how, when, where, to whom, and by what means the representations were tendered" ' "].)

The proposed first amended complaint alleges Souther and Galimi agreed to defraud the Estate by incorporating Get Flipped, selling Motion Graphix's assets to it for a price substantially below market value and dissolving Motion Graphix. There are different theories of how the fraud was accomplished, but at least one involves the allegedly express misrepresentations to the Estate in letters sent in February and March 2007 that a majority of shareholders had voted to approve the asset sale and to dissolve Motion Graphix.[18] The proposed amended complaint also alleges Thompson knew the Estate was still the majority shareholder of Motion Graphix and the misrepresentations, among others, were made with the intent to induce the Estate's reliance, so the Estate would not try to block the asset sale. These allegations are minimally adequate for a claim of conspiracy to commit fraud

---

[18] Because the Estate need not satisfy the requirements of section 1714.10, subdivision (a), and establish a reasonable probability it will prevail on the merits before filing its amended complaint, the issue before us is not the sufficiency of the Estate's proof the statement was false—that is, the claim Corrales's transfer of stock to Motion Graphix reducing his ownership to 20 percent was never completed—but the sufficiency of its allegations of fraud. (See *Brehm v. 21st Century Ins. Co.* (2008) 166 Cal.App.4th 1225, 1240 [83 Cal.Rptr.3d 410].)

against the attorneys—the " ' "how, when, where, to whom, and by what means" ' " (*Lazar v. Superior Court, supra,* 12 Cal.4th at p. 645) of the misrepresentation are specifically alleged, and the elements of the tort are sufficiently pleaded. Whether Galimi had left Katten Muchin before the express misrepresentations were made or Thompson was not involved at the outset of the purported fraudulent scheme is irrelevant; both attorneys are responsible for all acts done as part of the conspiracy if they knowingly agreed to commit fraud and intended to aid its commission. (See *de Vries v. Brumback, supra,* 53 Cal.2d at p. 648.)

## *The Derivative Action*

### 1. *The Estate Has Standing to Maintain a Derivative Action on Behalf of Motion Graphix*

Pursuant to Corporations Code section 2010, subdivision (a), although dissolved in April 2007, Motion Graphix continues to exist for the purpose of winding up its affairs, including prosecuting lawsuits to recover sums due or owing to it or to recover any of its property. (See *Peñasquitos, Inc. v. Superior Court* (1991) 53 Cal.3d 1180, 1185 [283 Cal.Rptr. 135, 812 P.2d 154] (*Peñasquitos*).) As a shareholder of the dissolved corporation the Estate is entitled to pursue a derivative action on its behalf, provided the other requirements for such an action have been satisfied. (See Corp. Code, § 800.)

### a. *The law of corporate dissolutions*

"At common law, the dissolution of a corporation was treated like the death of a natural person: Once it had dissolved, a corporation ceased to exist and could not sue or be sued, and any actions pending against it abated." (*Peñasquitos, supra,* 53 Cal.3d at p. 1184.) In 1929, however, former section 399 was enacted " ' "providing for the continuation of the corporate existence indefinitely for the purpose of winding up and settling the affairs of corporations which had been dissolved, rather than extinguishing the corporate existence and giving the administration of the surviving assets and liabilities to trustees. . . ." ' [Citations.] [¶] The statutory scheme enacted in 1929 for the postdissolution survival of corporations has endured with relatively few changes. Section 1905, subdivision (b), now provides that when the certificate of dissolution is filed, 'the corporate existence shall cease, *except for the purpose of further winding up if needed.*' (Italics added.) Section 2010, subdivision (a), further explains the purposes for which the corporate existence continues after dissolution: 'A corporation which is dissolved nevertheless continues to exist for the purpose of winding up its affairs, prosecuting and *defending actions* by or *against it* and enabling it to collect and *discharge obligations,* dispose of and convey its property and collect and divide its

assets, but not for the purpose of continuing business except so far as necessary for the winding up thereof.' (Italics added.)" (*Peñasquitos*, at p. 1185.) "Thus, a corporation's dissolution is best understood not as its death, but merely as its retirement from active business." (*Id.* at p. 1190.)

■ The shareholders of a dissolved corporation do not cease to exist as shareholders, nor do they lose all interest in, or responsibility for, the affairs of the corporation upon dissolution. For example, a vacancy in the board of directors after dissolution and during windup proceedings may be filled by the shareholders if not filled by the remaining directors. (Corp. Code, §§ 2002, 305, subd. (b).) In addition, Corporations Code section 2011, subdivision (a)(1), provides that causes of action against a dissolved corporation, "whether arising before or after the dissolution," may be enforced against the dissolved corporation to the extent it has any undistributed assets, including insurance that may be available to pay claims, or, if all the assets have been distributed to shareholders, then against the shareholders "to the extent of their pro rata share of the claim or to the extent of the corporate assets distributed to them upon dissolution of the corporation, whichever is less." However, "[a] shareholder's total liability . . . may not exceed the total amount of assets of the dissolved corporation distributed to the shareholder upon dissolution of the corporation." (Corp. Code, § 2011, subd. (a)(1)(B).)

The board of directors and officers of the dissolved corporation have the authority to act on the corporation's behalf to wind up its affairs. (See Corp. Code, §§ 1903, subd. (b) ["[w]hen a voluntary proceeding for winding up has commenced, the board shall continue to act as a board and shall have full powers to wind up and settle its affairs, both before and after the filing of the certificate of dissolution"], 2001 ["The powers and duties of the directors . . . and officers after commencement of a dissolution proceeding include, but are not limited to, the following acts in the name and on behalf of the corporation: [¶] (a) To elect officers and to employ agents and attorneys to liquidate or wind up its affairs. [¶] . . . [¶] (d) To defend suits brought against the corporation. [¶] (e) To sue, in the name of the corporation, for all sums due or owing to the corporation or to recover any of its property. . . ."].) Indeed, Motion Graphix's plan of dissolution is consistent with these provisions. Section 10 provides, "After the Effective Date, the officers of the Corporation are hereby authorized, empowered and directed to execute and deliver in the name of and on behalf of the Corporation, all assignments and other instruments of transfer as may be necessary or proper, and to do any and all acts and things necessary or desirable, to carry out, perform, implement and consummate the Plan [of dissolution]."

### b. *Requirements for a derivative action*

■ To bring or maintain a derivative action, Corporations Code section 800, subdivision (b)(1),[19] requires the plaintiff to own stock at the time of the challenged action—subject to an exception referred to as "the continuing wrong doctrine" not applicable here (*Kruss v. Booth* (2010) 185 Cal.App.4th 699, 724–725 [111 Cal.Rptr.3d 56])—as well as when the action is filed and throughout the duration of the litigation. (See *Grosset v. Wenaas* (2008) 42 Cal.4th 1100, 1119 [72 Cal.Rptr.3d 129, 175 P.3d 1184] (*Grosset*) ["a derivative plaintiff who ceases to be a stockholder by reason of a merger ordinarily loses standing to continue the litigation"].)

"Because a derivative claim does not belong to the stockholder asserting it, standing to maintain such a claim is justified only by the stockholder relationship and the indirect benefits made possible thereby, which furnish the stockholder with an interest and incentive to seek redress for injury to the corporation. [Citations.] Once this relationship ceases to exist, the derivative plaintiff lacks standing because he or she 'no longer has a financial interest in any recovery pursued for the benefit of the corporation.' [Citations.] As one court put it, allowing a plaintiff to retain standing despite the loss of stock ownership would produce 'the anomalous result that a plaintiff with absolutely no "dog in the hunt" is permitted to pursue a right of action that belongs solely to the corporation.' " (*Grosset, supra*, 42 Cal.4th at p. 1114; see also *id.* at p. 1118 ["[t]o ensure that the corporation's interests are adequately represented, the derivative plaintiff must maintain a proprietary interest in the corporation sufficient to motivate the plaintiff 'to engage in a zealous prosecution' "].)

---

[19] Corporations Code section 800, subdivision (b)(1), states, "No action may be instituted or maintained in right of any domestic or foreign corporation by any holder of shares or of voting trust certificates of the corporation unless both of the following conditions exist: [¶] (1) The plaintiff alleges in the complaint that plaintiff was a shareholder, of record or beneficially, or the holder of voting trust certificates at the time of the transaction or any part thereof of which plaintiff complains or that plaintiff's shares or voting trust certificates thereafter devolved upon plaintiff by operation of law from a holder who was a holder at the time of the transaction or any part thereof complained of; provided, that any shareholder who does not meet these requirements may nevertheless be allowed in the discretion of the court to maintain the action on a preliminary showing to and determination by the court, by motion and after a hearing, at which the court shall consider such evidence, by affidavit or testimony, as it deems material, that (i) there is a strong prima facie case in favor of the claim asserted on behalf of the corporation, (ii) no other similar action has been or is likely to be instituted, (iii) the plaintiff acquired the shares before there was disclosure to the public or to the plaintiff of the wrongdoing of which plaintiff complains, (iv) unless the action can be maintained the defendant may retain a gain derived from defendant's willful breach of a fiduciary duty, and (v) the requested relief will not result in unjust enrichment of the corporation or any shareholder of the corporation . . . ."

The attorneys contend, and the trial court ruled, the Estate lacks standing to pursue the derivative action because it was divested of ownership in Motion Graphix upon dissolution of the company. Accordingly, it did not own stock at the time the action was filed and is not able to satisfy the continuous ownership requirement. Corporations Code section 2010, subdivision (a), they argue, "merely gives legal personality to the dissolved *entity*, not its non-existent shareholders, to allow it to wind up its affairs once its corporate status no longer exists."

 The argument dissolution essentially eliminates the corporation's shareholders and their interest in the dissolved corporate entity is fundamentally at odds with the statutory scheme governing dissolution discussed above. Just as the dissolved corporation continues to exist for purposes including prosecuting and defending actions by or against it (Corp. Code, § 2010, subd. (c)), the shareholders continue to exist and to have rights and potential liabilities with respect to the dissolved corporation (see Corp. Code, § 2011, subd. (a)(1)). Although the trial court correctly observed there is no California authority directly supporting a dissolved corporation's shareholders' rights to pursue a derivative action, there similarly is no authority precluding such a proceeding; and, as a matter of public policy, since the shareholders may be responsible for postdissolution claims against the corporation, there is no reason to deny them the right to bring a derivative action, which may benefit them postdissolution, as long as the requirements of Corporations Code section 800 are met.[20]

Contrary to the attorneys' contention, *Peñasquitos, supra*, 53 Cal.3d 1180 does not support their argument Corporations Code section 2010, subdivision (a), provides for the continued limited existence of the corporation but not its shareholders. To be sure, although the *Peñasquitos* court held postdissolution claims could be asserted against a dissolved corporation, it distinguished postdissolution claims against the corporation's shareholders as claims that generally could not be maintained. (*Peñasquitos*, at p. 1194

---

[20] In addition to the continuous ownership requirement to bring a derivative claim, Corporations Code section 800, subdivision (b)(2), requires the plaintiff "allege[] in the complaint with particularity plaintiff's efforts to secure from the board such action as plaintiff desires, or the reasons for not making such effort, and allege[] further that plaintiff has either informed the corporation or the board in writing of the ultimate facts of each cause of action against each defendant or delivered to the corporation or the board a true copy of the complaint which plaintiff proposes to file." (See *Bader v. Anderson* (2009) 179 Cal.App.4th 775, 789 [101 Cal.Rptr.3d 821] ["As a precondition for bringing a derivative action on behalf of the corporation, the shareholder 'should show to the satisfaction of the court that he has exhausted all the means within his reach to obtain, within the corporation itself, the redress of his grievances, or action in conformity to his wishes. He must make an earnest, not a simulated effort, with the managing body of the corporation, to induce remedial action on their part, and this must be apparent to the court.' "].) The attorneys do not contend the prelawsuit demand requirement was not satisfied or excused in this case.

["[a]lthough an injured party whose claim arises after dissolution is generally precluded from pursuing a dissolved corporation's assets in the hands of its former shareholders, there is no legal barrier to a suit against a dissolved corporation itself for injury or damage that is caused by the corporation's predissolution activities but occurs or is discovered after the dissolution"].) The *Peñasquitos* court, however, was interpreting a prior version of Corporations Code section 2011, subdivision (a), which expressly limited claims against shareholders in the corporate name to those arising prior to the corporation's dissolution. (See Stats. 1976, ch. 641, § 30, p. 1566 ["[i]n all cases where a corporation has been dissolved, the shareholders may be sued in the corporate name of such corporation upon any cause of action against the corporation arising prior to its dissolution"]; *Peñasquitos*, at p. 1188 ["On its face, section 2010 draws no distinction between pre- and postdissolution claims. This is particularly significant in view of the language of section 2011, subdivision (a), which limits postdissolution actions against the dissolved corporation's shareholders to those on causes of action 'arising prior to [the corporation's] dissolution.' "].) In response to *Peñasquitos* the Legislature amended section 2011, subdivision (a), " 'to permit causes of action against the shareholders of dissolved corporations in the corporate name, within specified limits, regardless of whether the claims arose before or after dissolution.' " (Historical and Statutory Notes, 23E West's Ann. Corp. Code (2010 supp.) foll. § 2011, p. 201.) Thus, the distinction in *Peñasquitos* upon which the attorneys attempt to base their argument is at best irrelevant.

 The attorneys also argue basic canons of statutory construction prohibit an interpretation of Corporations Code section 2010, subdivision (a), that renders obsolete the continuous ownership requirement in Corporations Code section 800, subdivision (b). (See *Landrum v. Superior Court* (1981) 30 Cal.3d 1, 14 [177 Cal.Rptr. 325, 634 P.2d 352] ["a cardinal rule of statutory construction [is] 'every statute should be construed with reference to the whole system of law of which it is a part so that all may be harmonized and have effect' "].) Recognizing the right of a shareholder of a dissolved corporation to maintain a derivative action, however, in no way undermines the continuous ownership requirement, which is intended to ensure the derivative plaintiff, who is only indirectly benefitted by assertion of the action, has sufficient interest and incentive to vigorously pursue the lawsuit, that is, a continuing interest in " ' "the indirect benefit resulting from a realization upon the corporation's assets." ' " (*Grosset, supra,* 42 Cal.4th at p. 1108.) When a shareholder either voluntarily sells or involuntarily loses through a merger shares of stock in a corporation, that shareholder no longer has "even an indirect interest in any recovery pursued for the corporation's benefit. . . . '. . . Neither class of plaintiff retains a proprietary interest in the corporate enterprise.' " (*Id.* at pp. 1115–1116, citation omitted.) In contrast, the shareholder of a dissolved corporation retains his or her indirect interest

in any recovery pursued for the corporation's benefit. To the extent the action is successful and results in a monetary award, that asset will be distributed to the shareholders of record at the time of dissolution as a belated realization of the corporation's assets. (Cf. Corp. Code, § 2010, subd. (c) ["[a]ny assets inadvertently or otherwise omitted from the winding up continue in the dissolved corporation for the benefit of the persons entitled thereto upon dissolution of the corporation and on realization shall be distributed accordingly"].) Thus, the shareholder of the dissolved corporation continues to have a " ' "dog in the hunt." ' " (*Grosset*, at p. 1114.)

Although, as the trial court observed, this appears to be an issue of first impression in California, the New York Court of Appeals reached the same conclusion 30 years ago in *Independent Investor Protective League v. Time, Inc.* (1980) 50 N.Y.2d 259 [428 N.Y.S.2d 671, 406 N.E.2d 486]. Reversing a decision of the state intermediate appellate court, the court of appeals held a shareholder derivative action may be maintained even though initiated after the dissolution of the corporation in which the plaintiff owned stock and the distribution of the corporation's assets. After explaining the rationale for requiring the plaintiff to be a shareholder at the time of the alleged misconduct, the court considered New York's requirement of continuous ownership throughout the litigation, which is essentially the same as California's: "The requirement that ownership continue until commencement of the derivative action . . . is rooted in practical considerations. Although in a theoretical sense a derivative action is brought for the benefit of the corporation, 'In a very real sense . . . the standing of the shareholder is based on the fact that . . . he is defending his own interests as well as those of the corporation' [citations]. Where the plaintiff voluntarily disposes of the stock, his rights as a shareholder cease, and his interest in the litigation is terminated [citations]. Being a stranger to the corporation, the former stockowner lacks standing to institute or continue the suit. [¶] But when the corporation has dissolved, the shareholder's interest does not abruptly end. At a minimum, the stockholder possesses a substantial interest in the distribution of corporate assets. And, even if dissolution and distribution of assets are accomplished contemporaneously, the shareholder's stake in any cause of action existing in favor of the corporation remains quite real. From a purely analytical standpoint, then, a shareholder of a dissolved corporation has sufficient interest in a derivative action to satisfy the spirit of the rule requiring ownership at the commencement of the action." (*Id.* at pp. 263–264, fn. omitted.)

> 2. *A Remand Is Necessary for Further Consideration Whether the Attorneys' Inability to Disclose Privileged Information Bars the Estate's Derivative Claims Against Them Under* McDermott, Will

Relying on this court's decision in *McDermott, Will, supra*, 83 Cal.App.4th 378, the trial court held, even if the Estate had standing, it was

barred from pursing its derivative action against Motion Graphix's outside counsel in the absence of a waiver or exception to the lawyer-client privilege. In *McDermott, Will* we agreed a shareholder in a derivative action essentially "stands in the shoes" of the corporation, but found this is not true with respect to the lawyer-client privilege. The corporation, not the shareholder, is the holder of the privilege and the only party that can waive the privilege. Thus, the filing of a derivative action against outside counsel does not result in a waiver of the corporation's attorney-client privilege. (*Id.* at p. 383.)

We then held the derivative action against the law firm was barred because it was not clear "how an attorney [could] mount a defense in a shareholder derivative action alleging a breach of duty to the corporate client, where, by the very nature of such an action, the attorney is foreclosed, in the absence of any waiver by the corporation, from disclosing the very communications which are alleged to constitute a breach of that duty." (*McDermott, Will, supra,* 83 Cal.App.4th at p. 385.) We declined to apply the case-by-case approach adopted by some federal courts, which allows a shareholder access to privileged information in a derivative action on a "finding of good cause, including a likelihood that the corporate decision would be outside the protections of the business judgment rule." (*Ibid.*) As we explained, "[L]ong-standing California case authority has rejected this application of the federal doctrine, noting it contravenes the strict principles set forth in the Evidence Code of California which precludes any judicially created exceptions to the attorney-client privilege." (*Ibid.*)

The practical problem confronting a corporation's outside counsel named as a defendant in a derivative action that led to our decision in *McDermott, Will,* of course, is eliminated if the lawyer-client privilege has been waived by the privilege holder or otherwise no longer exists. Whether the trial court correctly concluded *McDermott, Will* applies and bars the Estate's derivative action in this case depends on the resolution of several difficult questions involving the lawyer-client privilege in the context of an asset sale followed immediately by a corporate dissolution.

 First, did Get Flipped acquire Motion Graphix's privilege when it acquired the company's assets? Evidence Code section 953, subdivision (d),[21] provides the successor to a corporation "that is no longer in existence" becomes the holder of the extinct corporation's lawyer-client privilege. (See

---

[21] Evidence Code section 953 states, "As used in this article, 'holder of the privilege' means: [¶] (a) The client, if the client has no guardian or conservator. [¶] (b) A guardian or conservator of the client, if the client has a guardian or conservator. [¶] (c) The personal representative of the client if the client is dead, including a personal representative appointed pursuant to Section 12252 of the Probate Code. [¶] (d) A successor, assign, trustee in dissolution, or any similar representative of a firm, association, organization, partnership, business trust, corporation, or public entity that is no longer in existence."

*Venture Law Group v. Superior Court* (2004) 118 Cal.App.4th 96, 103 [12 Cal.Rptr.3d 656] ["[a]fter a merger, the attorney-client privilege of the corporation no longer in existence belongs to the successor corporation"]; *Dickerson v. Superior Court* (1982) 135 Cal.App.3d 93, 98 [185 Cal.Rptr. 97].) However, in the absence of a merger or transfer of control of the corporation holding the privilege, the sale of the corporation's assets generally does not also transfer the privilege. (Cf. *HLC Properties, Ltd. v. Superior Court* (2005) 35 Cal.4th 54, 64 [24 Cal.Rptr.3d 199, 105 P.3d 560] ["To support its claim of privilege, HLC relies on several cases involving trusts and/or incorporated organizations to argue that control over the assets of a business organization brings with it the right to assert the attorney-client privilege. HLC's authorities, however, merely hold or recognize that when corporate organizations are merged or when control of a corporation or formalized trust passes to new management, the power to assert or waive the privilege resides in the new managers."].) In fact, to recognize an implied transfer of the privilege with a sale of assets would be contrary to the express language of section 953, subdivision (d), which identifies the successor or assign of a corporate entity as the holder of the privilege only when the original corporation "is no longer in existence." As we emphasized in *McDermott, Will, supra,* 83 Cal.App.4th at page 385, in applying the lawyer-client privilege, courts are obligated to strictly follow the statutory language. (See also *Hoiles v. Superior Court* (1984) 157 Cal.App.3d 1192, 1200 [204 Cal.Rptr. 111].) The trial court's conclusion the privilege transferred to Get Flipped with the sale of Motion Graphix's assets is incorrect.[22] Accordingly, the fact that Get Flipped had not waived the privilege does not resolve the *McDermott, Will* issue.

Second, if Get Flipped did not acquire the privilege from Motion Graphix, was the privilege nonetheless extinguished with Motion Graphix's dissolution? The Estate argues *McDermott, Will* is no bar to its derivative action against the attorneys because that privilege ceased to exist when the corporation dissolved. However, as we have discussed—and as the Estate itself urges in connection with the standing issue—a dissolved corporation continues to exist for various purposes. Because it continues in existence, not unlike the personal representative of an individual client who has died (see Evid. Code, § 953, subd. (c)), it would appear the persons authorized to act on the dissolved corporation's behalf during the windup process—its ongoing management personnel—should be able to assert the privilege, at least until all matters involving the company have been fully resolved and no further proceedings are contemplated. (Cf. *HLC Properties, Ltd. v. Superior Court,*

---

[22] As discussed below, because the trial court's ruling on the privilege issue in the individual action, made in connection with the Estate's claims against Souther, is not yet final, review of the court's decision is not precluded by the collateral estoppel doctrine. (See *Lucido v. Superior Court* (1990) 51 Cal.3d 335, 341 [272 Cal.Rptr. 767, 795 P.2d 1223].)

*supra*, 35 Cal.4th at p. 66 [entertainer's privilege, which had transferred to his personal representative upon the entertainer's death, terminated "once [the estate] was finally distributed and his personal representative discharged . . . because there was no longer any privilege holder statutorily authorized to assert it"].) Indeed, if the lawyer-client privilege is simply extinguished upon dissolution, then the corporation's ability to effectively prosecute or defend actions is eviscerated; and the shareholders who may be responsible for their pro rata portions of any claims are unfairly disadvantaged.

■ Third, does the crime-fraud exception (Evid. Code, § 956) apply, thus avoiding the problem identified in *McDermott, Will*? To invoke the crime-fraud exception, the proponent must make a prima facie showing that the services of the attorney were sought or obtained to aid someone in committing a crime or fraud. (*BP Alaska Exploration, Inc. v. Superior Court* (1988) 199 Cal.App.3d 1240, 1262 [245 Cal.Rptr. 682].) "Evidence Code section 956 does not require a completed crime or fraud. It applies to attorney communications sought to enable the client to *plan to commit* a fraud, whether the fraud is successful or not." (*Ibid.*; see also *Travelers Ins. Companies v. Superior Court* (1983) 143 Cal.App.3d 436, 447 [191 Cal.Rptr. 871] [communication must be " 'made in contemplation of crime' " for exception to apply].) "[I]t is the intent of the client upon which attention must be focused and not that of the lawyers." (*State Farm & Casualty Co. v. Superior Court* (1997) 54 Cal.App.4th 625, 645 [62 Cal.Rptr.2d 834].)

The trial court in a discovery ruling in the individual action held the Estate had not established the applicability of the crime-fraud exception and reaffirmed that ruling in the derivative action. Although the trial court was certainly entitled to, in effect, incorporate by reference its prior ruling on this issue, contrary to the attorneys' contention, the earlier ruling was not binding on either the trial court or this court in the derivative action under the doctrine of collateral estoppel because it was not final. (See *Lucido v. Superior Court, supra*, 51 Cal.3d at p. 341 [to preclude relegation of an issue under the doctrine of collateral estoppel, "the decision in the former proceeding must be final and on the merits"].) The initial discovery ruling was made in connection with the Estate's claims against Souther, not the attorneys. Any appellate challenge to that order can be made only after the action is final with respect to those claims; the Estate simply does not have standing to challenge any aspect of that discovery ruling in its appeal from the section 1714.10 order in the individual action.

■ At this point we would normally consider whether the trial court abused its discretion in concluding the Estate had failed to make a prima facie showing that the crime-fraud exception applied. (See *People v. Williams* (1997) 16 Cal.4th 153, 196–197 [66 Cal.Rptr.2d 123, 940 P.2d 710] [trial

court's evidentiary rulings normally reviewed for abuse of discretion]; *BP Alaska Exploration, Inc. v. Superior Court, supra,* 199 Cal.App.3d at pp. 1261–1262 [motion to compel discovery involving crime-fraud exception cannot be overturned in absence of an abuse of discretion].) However, a demurrer based on *McDermott, Will* is unlike most pleading motions; for it asks the trial court to speculate about matters in the future (can the lawyer-defendant adequately defend the case if privileged information cannot be disclosed), rather than to evaluate the legal sufficiency of the complaint actually before it. Accordingly, if a demurrer to a derivative complaint against outside counsel would otherwise be overruled but for the *McDermott, Will* issue and there appears to be a realistic possibility that litigation of the remainder of the action against corporate insiders will result in a waiver of the corporation's privilege or produce additional evidence supporting an exception to that privilege, the trial court should not sustain the demurrer and dismiss the action.[23] Rather, under these circumstances, the appropriate action is for the court to conditionally stay further proceedings against outside counsel, including discovery as to the causes of action against them, and defer consideration of any demurrer or judgment on the pleadings based on counsel's inability to defend because of the lawyer-client privilege.

It would be unfair to the derivative plaintiff and unnecessary to the preservation of the lawyer-client privilege to dismiss the lawsuit based on the *McDermott, Will* holding only to see the attorneys' client willingly waive its privilege to permit other defendants to defend themselves in the same lawsuit or to discover after such a dismissal that the evidence developed in the lawsuit against the allegedly culpable corporate insiders establishes the applicability of the crime-fraud exception of Evidence Code section 956. Thus, the conditional stay should remain in place until the derivative plaintiff can demonstrate the privilege has been waived or the crime-fraud exception established or, alternatively, when the litigation between the derivative plaintiff and the other defendants has been finally resolved, by settlement or judgment, without a waiver or other basis for disregarding the privilege. At that time the trial court may consider and, if appropriate, sustain a demurrer or grant judgment on the pleadings on the causes of action against outside counsel based on *McDermott, Will.*

Here, the Estate's litigation against Souther and Get Flipped has continued.[24] Thus, on remand the trial court should be able to resolve these issues without a further stay. The Estate may not have submitted any evidence on

---

[23] Here, of course, the trial court ruled the Estate lacked standing and sustained the demurrer on that basis, as well—a ruling we reverse.

[24] Shortly before oral argument we were advised the bench trial has been completed in the individual action and a proposed statement of decision filed by the trial court. A hearing on defendants' objections to the proposed statement of decision is scheduled for later this month. The Estate's request for judicial notice of the proposed statement of decision is denied. (See

the crime-fraud exception beyond that presented in connection with its initial motion to compel discovery, but the trial court should make this determination in the first instance. In addition, the court can also decide whether Motion Graphix's privilege has been waived in connection with Souther's defense in the ligation (for example, by arguing any purported misconduct was based on the advice of counsel).

### 3. None of the Other Grounds Advanced by the Attorneys Supports an Order Sustaining Their Demurrer to the Derivative Complaint

The attorneys contend several independent grounds, presented with their demurrer but not ruled upon by the trial court, support the trial court's order sustaining the demurrer. (See *Rodas v. Spiegel* (2001) 87 Cal.App.4th 513, 517 [104 Cal.Rptr.2d 439] [appellate court determines whether trial court correctly sustained the demurrer, not whether court's reasons for doing so were valid].) None has merit.

First, the attorneys contend there is no basis for holding Galimi liable because the purportedly illegal asset sale and dissolution occurred several months after he left Katten Muchin. Notwithstanding Galimi's departure before the transactions were consummated, the Estate has adequately alleged Galimi participated in advising Souther to sell Motion Graphix's assets for insufficient consideration and without the shareholder approval required by the Corporations Code. Those allegations are sufficient to state claims for legal malpractice and breach of fiduciary duty.

Second, the claims in the derivative action against the attorneys are not encompassed by the claims asserted by the Estate in the individual action or barred by the doctrine of res judicata. A direct claim by the Estate against the attorneys for a conspiracy with Souther to defraud it—the only remaining, viable claim in the individual action—is entirely separate and distinct from the derivative claims for legal malpractice and breach of fiduciary duty being pursued on behalf of Motion Graphix. (See *Patrick v. Alacer Corp.* (2008) 167 Cal.App.4th 995, 1003 [84 Cal.Rptr.3d 642] [" '[T]he particular stockholder who brings the [derivative] suit is merely a nominal party plaintiff.' [Citation.] It is the corporation that 'is the ultimate beneficiary of such a derivative suit.' [Citation.] Thus, '[t]he corporation [is] the real party plaintiff in the action.' "]; see also *Desaigoudar v. Meyercord* (2003) 108 Cal.App.4th 173, 183 [133 Cal.Rptr.2d 408] ["[t]he 'derivative' action is so called because the rights of the plaintiff shareholders derive from the primary corporate right to redress the wrongs against it"].) The individual fraud claim and the derivative

*Arce v. Kaiser Foundation Health Plan, Inc.* (2010) 181 Cal.App.4th 471, 482 [104 Cal.Rptr.3d 545] [although judicial notice can be taken of the existence and effect of a court document, judicial notice cannot be taken that the matters stated in the document are true].)

malpractice claim involve different primary rights (see *Crowley v. Katleman* (1994) 8 Cal.4th 666, 681 [34 Cal.Rptr.2d 386, 881 P.2d 1083]; *Branson v. Sun-Diamond Growers* (1994) 24 Cal.App.4th 327, 342 [29 Cal.Rptr.2d 314]); and, in any event, there has been no final judgment entered in the individual action. Both are essential elements for claim preclusion under the doctrine of res judicata. (See *Mycogen Corp. v. Monsanto Co.* (2002) 28 Cal.4th 888, 896 [123 Cal.Rptr.2d 432, 51 P.3d 297]; *Slater v. Blackwood* (1975) 15 Cal.3d 791, 795 [126 Cal.Rptr. 225, 543 P.2d 593].)

 Third, the attorneys cannot defeat the Estate's derivative claims for legal malpractice and breach of fiduciary duty on demurrer based on their affirmative defense of the statute of limitations. A cause of action for legal malpractice must be filed "within one year after the plaintiff discovers, or through the use of reasonable diligence should have discovered, the facts constituting the wrongful act or omission, or four years from the date of the wrongful act or omission, whichever occurs first." (Code Civ. Proc., § 340.6, subd. (a).)[25] "[U]nder the provisions of section 340.6, discovery of the negligent act or omission initiates the [one-year] statutory period . . . ." (*Adams v. Paul* (1995) 11 Cal.4th 583, 589, fn. 2 [46 Cal.Rptr.2d 594, 904 P.2d 1205].) The same limitations period governs the Estate's derivative claim for breach of fiduciary duty (see *Stoll v. Superior Court* (1992) 9 Cal.App.4th 1362, 1363 [12 Cal.Rptr.2d 354] ["statute of limitations within which a client must commence an action against an attorney on a claim for legal malpractice or breach of a fiduciary duty is identical"]), as well as its claim for unjust enrichment, seeking restitution for legal fees paid by Motion Graphix for allegedly deficient legal advice. (See *Levin v. Graham & James* (1995) 37 Cal.App.4th 798, 805 [44 Cal.Rptr.2d 69] ["[i]n all cases other than actual fraud, whether the theory of liability is based on the breach of an oral or written contract, a tort, or a breach of fiduciary duty, the one-year statutory period applies"]; *Quintilliani v. Mannerino* (1998) 62 Cal.App.4th 54, 68 [72 Cal.Rptr.2d 359] [same].)

In *Samuels v. Mix* (1999) 22 Cal.4th 1 [91 Cal.Rptr.2d 273, 989 P.2d 701] the Supreme Court confirmed the one-year-from-discovery provision in Code

---

[25] Code of Civil Procedure section 340.6, subdivision (a), also provides, "[I]n no event shall the time for commencement of legal action exceed four years except that the period shall be tolled during the time that any of the following exist: [¶] (1) The plaintiff has not sustained actual injury. [¶] (2) The attorney continues to represent the plaintiff regarding the specific subject matter in which the alleged wrongful act or omission occurred. [¶] (3) The attorney willfully conceals the facts constituting the wrongful act or omission when such facts are known to the attorney, except that this subdivision shall toll only the four-year limitation. [¶] (4) The plaintiff is under a legal or physical disability which restricts the plaintiff's ability to commence legal action."

of Civil Procedure section 340.6[, subdivision] (a), like the statute's four-years-from-wrongful-act provision, is an affirmative defense to a cause of action for attorney malpractice. (*Samuels*, at p. 7.) "Just as plainly as section 340.6, subdivision (a) makes the plaintiff's actual or constructive discovery of the defendant's wrongdoing an element of its one-year-from-discovery limitations defense, it does *not*—nor does any other law—make the plaintiff's actual or constructive discovery of the defendant's wrongdoing an element of a prima facie claim for attorney malpractice." (*Id.* at p. 8.) Accordingly, the burden of pleading and proving the plaintiff's actual or constructive discovery of the defendant's wrongdoing falls on the defendant. (*Ibid.*) In this respect, the alternate one-year-from-discovery limitation on attorney malpractice actions is quite different from the nominally similar delayed discovery rule in tort actions, which operates to enlarge a plaintiff's time to file suit and which must be affirmatively pleaded by the plaintiff. (*Id.* at p. 10; see *Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 815 [27 Cal.Rptr.3d 661, 110 P.3d 914] ["plaintiff seeking to utilize the discovery rule must plead facts to show his or her inability to have discovered the necessary information earlier despite reasonable diligence"].)

 As this court explained in *Lockley v. Law Office of Cantrell, Green, Pekich, Cruz & McCort* (2001) 91 Cal.App.4th 875, 881 [110 Cal.Rptr.2d 877], " 'A demurrer on the ground of the bar of the statute of limitations will not lie where the action may be, but is not necessarily barred.' [Citations.] It must appear clearly and affirmatively that, upon the face of the complaint [and matters of which the court may properly take judicial notice], the right of action is necessarily barred. [Citations.] This will not be the case unless the complaint alleges every fact which the defendant would be required to prove if he were to plead the bar of the applicable statute of limitation as an affirmative defense." (Accord, *Holiday Matinee, Inc. v. Rambus, Inc.* (2004) 118 Cal.App.4th 1413, 1421 [13 Cal.Rptr.3d 766] [although general demurrer does not ordinarily reach affirmative defenses, it " 'will lie where the complaint "has included allegations that *clearly* disclose some defense or bar to recovery" ' "].)

Here, although the Estate knew about the purportedly illegal asset sale to Get Flipped in February 2007 and the subsequent decision to dissolve Motion Graphix in March 2007, the Estate alleges it did not know any attorneys had assisted in the transactions and did not learn of Katten Muchin's involvement, and thus its malpractice, until Souther's and Thompson's depositions were taken in the individual action in February and April 2008, less than one year prior to the filing of the derivative complaint for malpractice and breach of

fiduciary duty.[26] Thus, while the Estate's derivative claims against Souther for breach of his fiduciary duties to Motion Graphix may have fully accrued by late March 2007, its claim that Motion Graphix's outside counsel failed to perform competently did not. (Cf. *Fox v. Ethicon Endo-Surgery, Inc., supra,* 35 Cal.4th at pp. 814–815 ["[A] diligent plaintiff's investigation may only disclose an action for one type of tort (e.g., medical malpractice) and facts supporting an entirely different type of tort action (e.g., products liability) may, through no fault of the plaintiff, only come to light at a later date. Although both claims seek to redress the same physical injury to the plaintiff, they are based on two distinct types of wrongdoing and should be treated separately in that regard."].)

The attorneys dispute the veracity of these allegations, arguing the Estate must have known Katten Muchin represented Motion Graphix because Corrales had signed a conflict waiver in March 2005 that stated, "[Katten] has agreed to undertake the representation of Motion Graphix, Inc. . . . our firm's client is [Motion Graphix] not you nor any other shareholder of [Motion Graphix]." Accordingly, the Estate had sufficient information to be charged with actual knowledge or, at least, constructive discovery of Katten Muchin's wrongdoing more than a year prior to the commencement of the lawsuit.

The March 2005 conflict letter, however, states Katten Muchin's representation was "in connection with the reorganization of [Motion Graphix's] stock ownership" occurring at that time. Even if we were to take judicial notice of that letter, it does not appear clearly and affirmatively from the allegations in the complaint and the letter that the Estate's derivative claims are time-barred. This issue must be resolved on summary judgment or at trial, not on a demurrer.

## DISPOSITION

The order denying the petition and motion for leave to file an amended complaint in the individual action and the judgment of dismissal in the derivative action are reversed. The matters are remanded for proceedings not

---

[26] In the abstract, because this is a derivative action on behalf of Motion Graphix, the limitations question is when did Motion Graphix have actual or constructive knowledge of Katten Muchin's alleged wrongdoing. However, because Souther was the president and sole director of Motion Graphix and, according to the Estate's complaint, was in full control of the corporation, at least at the pleading stage the adverse domination doctrine precludes imputing Souther's knowledge of Katten Muchin's role as corporate counsel to Motion Graphix for purposes of ascertaining accrual of the statute of limitations. (See *San Leandro Canning Co., Inc. v. Perillo* (1931) 211 Cal. 482, 487 [295 P. 1026] ["the statute of limitations does not commence to run against unlawful acts and expenditures made by or under the direction of the directors of the corporation while they were in full control of its affairs and of the expenditure of its funds"].)

inconsistent with this opinion. The Estate is to recover its costs on appeal. The attorneys' motion for sanctions on the ground the Estate's appeal in the derivative action is frivolous is denied.

Zelon, J., and Jackson, J., concurred.

A petition for a rehearing was denied September 22, 2010, and the opinion was modified to read as printed above. Respondents' petition for review by the Supreme Court was denied December 15, 2010, S187287.