Filed 9/22/15  HS Zamir, Ltd. v. Mattern CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| HS ZAMIR, LTD., | B256082 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC519723) |
| v. | |
| STEPHEN MATTERN et al., | |
| Defendants and Respondents. | |

————————————

APPEAL from a judgment of the Superior Court of Los Angeles County, Michael Stern, Judge.  Affirmed in part, reversed in part.

Law Offices of Daniel Friedlander and Daniel Freidlander; Tobi Law Group and Yael Tobi for Plaintiff and Appellant.

Blady Weinreb Law Group and Marnin Weinreb for Defendants and Respondents Stephen Mattern and Chang Mattern, LLP.

————————————

HS Zamir, Ltd., a diamond wholesaler, appeals from the judgment entered after the trial court sustained without leave to amend the demurrer of Chang Mattern, LLP and Stephen Mattern (collectively Mattern) to Zamir's second amended complaint alleging causes of action including legal malpractice, breach of fiduciary duty, fraud and intentional interference with contractual relations. Zamir contends the trial court erred in finding it had not sufficiently pleaded an attorney-client relationship with Mattern, who allegedly represented Zamir in a collections dispute, and had failed to allege the fraud claims with sufficient specificity. We affirm the trial court's ruling with respect to all the causes of action except intentional and negligent misrepresentations, which have been sufficiently pleaded.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *The Dismissed Complaint Against the Yomtoubians*

In January 2013 Zamir filed a complaint against long-time customers Jack Yomtoubian, Daryoush Yomtoubian, Aaron Yomtoubian, Manoucher Yomtoubian and entities affiliated with them, including DJM Jewelry, Inc. (DJM) and Diamond Jewelry Mart, arising out of their failure to pay for diamonds purchased over several years (the Yomtoubian action). The complaint, asserting causes of action for breach of contract and fraud, among others, alleged Zamir's president, Shay Hordishetz, had developed a deep friendship with the Yomtoubians after he began selling diamonds to them in 1994. Beginning in 2003 the Yomtoubians paid Zamir entirely with postdated checks, sometimes asking Hordishetz to delay depositing the checks until after the postdate.[1] Gradually, the number of postdated checks Hordishetz was able to deposit was reduced. Hordishetz, however, continued to do business with the Yomtoubians based on their

---

[1] For convenience, we generally refer to the defendants collectively as the Yomtoubians, but identify a specific business entity when necessary for clarity. Because the Yomtoubians share a surname, we refer to them individually by their first names. Additionally, we occasionally refer to Hordishetz instead of Zamir because Hordishetz was the person acting on behalf of Zamir.

assurances they had substantial assets and repeated promises to pay the outstanding balance and any damages Zamir incurred as a result of the delayed payment.

By 2009 a debt of more than $4 million had accrued. The complaint alleged, after the Yomtoubians offered to secure the debt with real property, "Defendants caused the drafting" of a promissory note in the amount of $3.5 million secured by a deed of trust encumbering property in Orange, California that Jack represented had a value between $700,000 and $800,000. The lender was Zamir; the borrower DJM. The September 9, 2009 note, which did not provide for interest on the outstanding balance, required payment of 87 monthly installments of $40,000 followed by one installment of $20,000. It further provided, "for purposes of notice, the address of the parties shall be" Hordishetz at his address in Israel for the lender and Mattern's and Jack's addresses for the borrower and trustor. The complaint alleged, "When the Promissory Note was completed, Defendants pressured Zamir to sign the Agreement without a careful review and without obtaining the opinion of a neutral attorney." The note was signed by Hordishetz on behalf of Zamir and by Jack on behalf of DJM and as trustor under the deed of trust.

The Yomtoubians had satisfied $200,000 to $300,000 of the debt when they stopped making any payments. They repeatedly made excuses for the missed payments and renewed their promises to pay: "For example, in or about July 2010, Defendants promised that they would fully satisfy the obligation and account for Zamir's damages after a lawsuit that was pending at the time against them[, the Camellia lawsuit,] was completed . . . within only a few months." (Although not alleged in the complaint, Mattern represented the Yomtoubians in the Camellia lawsuit.) The Yomtoubians eventually offered to pay down a portion of the debt with property in Ventura County purportedly owned by Daryoush, which Jack and Daryoush represented had a value of approximately $2 million. The complaint alleged, "On or about August 2, 2010, Defendants caused the drafting of a Second Agreement titled 'Real Property Transfer Agreement.'" The transfer agreement between DJM (the borrower) and Zamir (the lender) provided the market value of the property would be determined within 18 months and the amount credited toward the outstanding debt. It further provided notice to the

3

lender was to be sent to Hordishetz and notice to the borrower was to be sent to Mattern, Jack on behalf of DJM, and Daryoush.  To effectuate the transfer, Daryoush executed a grant deed conveying the property to Hordishetz as his sole and separate property.[2]  Jack, however, requested Hordishetz refrain from recording the transfer agreement and grant deed.

The Yomtoubians made only a few small payments after the transfer agreement was executed.  In February 2011 the parties entered into an oral agreement providing Hordishetz would forbear enforcement of the promissory note in exchange for the Yomtoubians paying the outstanding balance, plus interest and any damages, within four months or after a decision in the Camellia lawsuit, whichever occurred first.  Because the Yomtoubians subsequently failed to make payment pursuant to the oral agreement, Jack gave Hordishetz two quitclaim deeds for property in the City of South Laguna Beach, representing each was worth between $800,000 to $1.2 million.  Jack convinced Hordishetz not to record the deeds.

After the Yomtoubians failed to make any additional payments, Zamir filed the Yomtoubian action, case No. BC499037, in Los Angeles Superior Court.  The complaint in part alleged the defendants breached the promissory note by failing to make payments, breached the transfer agreement by failing to make payments and by failing to actually transfer the Ventura County property to Zamir, interfered with Zamir's contractual relations by transferring all of DJM's assets out of the company and engaged in fraud by concealing and misrepresenting material facts.

2. *The Initial Complaint Against Mattern in the Instant Matter*

On August 28, 2013, while the Yomtoubian action was still pending, Zamir filed the instant action against Mattern, asserting causes of action for legal malpractice, breach of fiduciary duty, negligent and intentional misrepresentation, concealment and tort of another (the Mattern action).  The complaint alleged, notwithstanding the provisions in

---

[2]     The promissory note and deed of trust, as well as the transfer agreement and grant deed, were attached as exhibits to the complaint.

4

the promissory note and transfer agreement designating Mattern as one of the people to whom to send notice on behalf of DJM, Mattern had represented Zamir in connection with collection of the debt owed by the Yomtoubians. The complaint explained Hordishetz and Mattern's wife, Flor, were close friends, and Flor had suggested Hordishetz talk to Mattern about assistance in collecting the balance owed by the Yomtoubians: "Flor told Plaintiff that Mattern was a good and honest attorney who could help Zamir deal with the outstanding obligation owed by the Yomtoubians."

In early September 2009 Hordishetz allegedly flew to Los Angeles from his home in Israel to meet with Mattern. The complaint alleged, "Flor picked Hordishetz [up] from the airport and drove him straight to Mattern's house where [he] conferred with Mattern and with Flor. [¶] . . . [Hordishetz's] visit at Mattern's house concluded with Hordishetz agreeing to meet Mattern at his offices to further discuss the most effective way to address the Yomtoubians' obligations." A few days later Flor told Hordishetz Mattern was ready to meet. When Hordishetz arrived at Mattern's office, he saw the promissory note for the first time. Mattern explained some of the terms to Hordishetz, who "is not fluent in English." Jack was also at the meeting, and Mattern "confirmed with Jack that Jack could afford and was willing to pay the installments listed in the Promissory Note and that Jack understood what was obligated of him." Although the complaint did not allege Zamir had retained Mattern or that there was an oral agreement of any kind, Hordishetz was certain during the September 9, 2009 meeting "that Mattern was Zamir's Counsel based on Mattern's conduct and because Flor made it clear to [Hordishetz] that the Promissory Note was drafted on Plaintiff's behalf. Indeed, Mattern advised [Hordishetz] on the terms of the Agreement and counseled [Hordishetz] on various matters, including the need to notarize the Deed of Trust."

The complaint alleged Mattern engaged in wrongful conduct, including intentionally leading Hordishetz to believe Mattern was representing Zamir; failing to disclose he represented the Yomtoubians in connection with other business transactions and litigation, including the Camellia lawsuit; orally informing Hordishetz that defendants would make weekly payments, consistent with his agreement with Jack and

5

past conduct, whereas the promissory note provided for monthly payments; drafting the promissory note to obligate only DJM and failing to provide for interest on the outstanding debt notwithstanding Jack had promised to be personally responsible and to pay interest; concealing that the Ventura County property purportedly conveyed pursuant to the terms of the transfer agreement was not owned solely by Daryoush and thus the grant deed executed by Daryoush in favor of Hordishetz was ineffective; and informing Hordishetz the Laguna properties transferred by quitclaim deed were "free and clear" when they were in actuality subject to liens.

3. *The First Amended Complaint Against Mattern and the Yomtoubians; the Demurrer*

On October 3, 2013, shortly after Zamir's ex parte application to file a second amended complaint in the Yomtoubian action was denied and its first amended complaint in that action was voluntarily dismissed, Zamir filed a verified first amended complaint in the Mattern action against Mattern and the Yomtoubians and their related business entities. The new pleading essentially combined the allegations of the two lawsuits, which had been pending in different departments of the superior court. The amended complaint asserted 15 causes of action. Against Mattern alone, Zamir alleged claims for legal malpractice, breach of fiduciary duty and negligent misrepresentation; the causes of action asserted against Mattern in combination with the Yomtoubians and some or all of the related entities were for intentional interference with contractual relations, fraudulent transfer, concealment and intentional misrepresentation. The first amended complaint also added several allegations of wrongdoing against Mattern including advising the Yomtoubians to form Diamond Jewelry Mart and to transfer all of DJM's assets to it and the Yomtoubians personally, leaving behind a shell unable to fulfill its obligations to Zamir (and creditors in the Camellia lawsuit).

Mattern demurred to the first amended complaint, in part contending Zamir had failed to sufficiently plead it had an attorney-client relationship with Zamir, the fraud claims were not pleaded with sufficient specificity, and there was no basis for the cause of action for intentional interference with contractual relations. At the outset of the

6

demurrer hearing, which also included consideration of the Yomtoubians' demurrer, the court announced its tentative decision to sustain Mattern's demurrer as to all the causes of action asserted against him without leave to amend on the grounds the complaint did not sufficiently allege Mattern was Zamir's attorney or that he had engaged in fraud or a conspiracy with the Yomtoubians to defraud Zamir.[3] After hearing argument the court agreed to permit Zamir to amend the complaint, but cautioned, "I don't know what you can say differently. If you say it in more words than you have now, it's just going to be more confusing . . . ."

### 4. *The Second Amended Complaint and Demurrer*

In the verified second amended complaint in the Mattern action Zamir added to, and slightly modified, its allegations describing Hordishetz's trip to Los Angeles to meet with Mattern to make explicit Mattern had expressly agreed to represent Zamir: "In reliance on Flor's representations [that Mattern was a 'good and honest attorney' who could help Zamir in its collection efforts], on or about September 6, 2009, Hordishetz flew to . . . Los Angeles from Israel to meet and hire Mattern to represent Zamir. Flor picked Hordishetz [up] from the airport and drove him straight to Mattern's house where Plaintiff conferred with Mattern and with Flor. The parties orally agreed that Mattern would represent Plaintiff in connection with the obligations that DJM and the Yomtoubians owed to Plaintiff. Plaintiff advised Mattern of Jack's promises (regarding weekly payment and securing the obligation owed) and Mattern suggested that he would draft an agreement on Plaintiff's behalf to protect Plaintiff's interest and formalize the agreement with the Yomtoubians." Although Zamir was prepared to pay Mattern's legal fees, the complaint alleged, after the promissory note was executed, Mattern told Hordishetz the Yomtoubians agreed to pay his legal fees because the note had to be drafted as a result of their failure to pay the debt.

---

3     Before hearing argument the court asked the parties to explain the status of the Yomtoubian action, which had been mentioned in the briefs. Counsel for Zamir explained it had been voluntarily dismissed. The court ruled Zamir was required to file a notice of related case.

Mattern demurred to the second amended complaint, in part contending the allegation of an oral contract should be disregarded as a sham pleading because it contradicted the allegation in the complaint in the dismissed Yomtoubian action, as well as the first amended complaint in the Mattern action, that the Yomtoubians, not Zamir, had "caused the drafting" of the promissory note. Mattern further contended the second amended complaint still failed to allege the fraud claims with sufficient specificity and the privilege to advise rule barred Zamir's claim for intentional interference with contractual relations. The court sustained the demurrer without leave to amend, finding the second amended complaint failed to sufficiently allege Mattern had represented Zamir and there was a "lack of specificity as to the fraud, notwithstanding [there were] a lot of allegations." The court explained Zamir had "detailed relationships. That doesn't constitute fraud." The court also appears to have sustained the demurrer to the intentional interference cause of action on the ground it was not pleaded with the specificity required for a fraud claim.

## DISCUSSION

1. *Standard of Review*

A demurrer tests the legal sufficiency of the factual allegations in a complaint. We independently review the trial court's ruling on a demurrer and determine de novo whether the complaint alleges facts sufficient to state a cause of action. (*Committee for Green Foothills v. Santa Clara Bd. of Supervisors* (2010) 48 Cal.4th 32, 42; *Aubry v. Tri–City Hospital Dist.* (1992) 2 Cal.4th 962, 967.) We assume the truth of the properly pleaded factual allegations, facts that reasonably can be inferred from those expressly pleaded and matters of which judicial notice has been taken. (*Evans v. City of Berkeley* (2006) 38 Cal.4th 1, 20; *Schifando v. City of Los Angeles* (2003) 31 Cal.4th 1074, 1081.) We liberally construe the pleading with a view to substantial justice between the parties. (Code Civ. Proc., § 452; *Schifando*, at p. 1081.)

8

2. *The Absence of an Attorney-client Relationship Between Zamir and Mattern Is Fatal to Its Legal Malpractice, Breach of Fiduciary Duty and Concealment Claims*

Generally, "the attorney-client relationship is created by some form of contract, express or implied, formal or informal." (*Fox v. Pollack* (1986) 181 Cal.App.3d 954, 959; accord, *Strasbourger Pearson Tulcin Wolff Inc. v. Wiz Technology, Inc.* (1999) 69 Cal.App.4th 1399, 1404; see *Lister v. State Bar* (1990) 51 Cal.3d 1117, 1126 ["'No formal contract or arrangement or attorney fee is necessary to create the relationship of attorney and client. It is the fact of the relationship which is important.'"].) "'An implied contract is one, the existence and terms of which are manifested by conduct.'" (*Responsible Citizens v. Superior Court* (1993) 16 Cal.App.4th 1717, 1732-1733; see Civ. Code, § 1621.) A party's unilateral belief an attorney-client relationship has been created, however, is insufficient "unless reasonably induced by representations or conduct" of the putative attorney. (*Fox*, at p. 959.) To adequately state a claim predicated on an attorney-client relationship, the plaintiff must allege "evidentiary facts from which such a conclusion could reasonably be drawn." (*Ibid.*)

Zamir argues the second amended complaint in the instant case alleges both an express oral agreement with Mattern to represent Zamir and facts from which an implied contract to represent it arose. We agree the second amended complaint, considered in isolation, sufficiently alleges an attorney-client relationship. Nonetheless, those allegations contradict, and cannot be reconciled with, the allegations in the dismissed Yomtoubian action. The principle of "'"truthful pleading"'" requires us to disregard "facts that contradict the facts or positions that the plaintiff pleaded in earlier actions" or in a pleading in the same action. (*Cantu v. Resolution Trust Corp.* (1992) 4 Cal.App.4th 857, 877-878, italics omitted; accord, *Larson v. UHS of Rancho Springs, Inc.* (2014) 230 Cal.App.4th 336, 344.) "When the plaintiff pleads inconsistently in separate actions, the plaintiff's complaint is nothing more than a sham that seeks to avoid the effect of a demurrer." (*Ibid.*, emphasis omitted; *Larson*, at p. 344.) "'The sham pleading doctrine is not "'intended to prevent honest complainants from correcting erroneous allegations . . .

9

or to prevent correction of ambiguous facts.'" [Citation.] Instead, it is intended to enable courts "'to prevent an abuse of process.'" [Citation.]' [Citations.] Plaintiffs therefore may avoid the effect of the sham pleading doctrine by alleging an explanation for the conflicts between the pleadings." (*Larson*, at p. 344.)

The complaint in the Yomtoubian action alleged "Defendants caused the drafting" of the promissory note and the property transfer agreement—that is, that they, not Zamir, initiated the drafting of the promissory note by Mattern. This factual allegation is directly at odds with allegations in the second amended complaint at issue here that Hordishetz retained Mattern to formalize his oral agreement with the Yomtoubians to pay the outstanding debt—that is, Zamir, represented by Mattern, initiated the drafting of the promissory note on Zamir's behalf.

This inconsistency alone might be attributable to inartful pleading and, without more, might not be sufficient to warrant the conclusion the express allegation of an attorney-client relationship should be disregarded as a sham; but the complaint in the Yomtoubian action further alleged, "When the Promissory Note was completed, Defendants pressured Zamir to sign the agreement without a careful review and without obtaining the opinion of a neutral attorney." While in hindsight, according to the allegations of the second amended complaint, Mattern was not "neutral" with respect to advising Zamir, the clear import of these two allegations is that Hordishetz, without legal representation, was rushed into signing an agreement he did not understand that had been drafted by Mattern at the behest of the Yomtoubians.[4] This scenario is manifestly inconsistent with the second amended complaint, and Zamir has never provided any explanation for the inconsistencies. (See *Deveny v. Entropin*, *Inc.* (2006)

_____

4    In addition to repeatedly emphasizing the promissory note was drafted by Mattern on Zamir's behalf, not the Yomtoubians', the second amended complaint alleged Mattern explained some of the terms to Hordishetz, who is not fluent in English, and "counseled" him as to its terms, as well as various other matters including the need to notarize the deed of trust.

10

139 Cal.App.4th 408, 426 ["the party who made the pleadings must be allowed to explain the changes"].)

Moreover, a comparison of the first and second amended complaints in the present action supports the conclusion the attorney-client relationship allegations constitute sham pleadings. Although the second amended complaint alleged Flor assured Hordishetz that Mattern was a good and honest attorney and Mattern assured Hordishetz he would draft the promissory note "on [Zamir's] behalf to protect [Zamir's] interest," in support of the 11th cause of action for intentional misrepresentation the first amended complaint alleged, "Jack falsely advised Hordishetz that Mattern could draft the Promissory Note because Mattern was [an] honest, neutral, and fair attorney. Jack further advised Hordishetz that Mattern was going to draft the Promissory Note on everyone's behalf."[5] While the allegations might be reconcilable if Zamir's theory was that Hordishetz believed Mattern was representing both parties, in its reply brief Zamir argued, "Zamir neither contacted another attorney, nor believed he needed to. He believed that Mattern was his attorney, and his attorney alone."

In sum, disregarding as sham the allegations that Mattern expressly agreed to represent Zamir or somehow conveyed through his actions that he was acting on behalf of Zamir and not the Yomtoubians, the trial court correctly concluded Zamir failed to allege the existence of an attorney-client relationship with Mattern. As such, it cannot state a cause of action for legal malpractice.

Zamir's additional contention that, even in the absence of an attorney-client relationship, it is entitled to pursue a claim for breach of fiduciary duty against Mattern is without merit. Because the only factual basis alleged for a fiduciary relationship between Mattern and Zamir was the attorney-client relationship, the cause of action for breach of fiduciary duty necessarily fails. (See *Charnay v. Cobert* (2006) 145 Cal.App.4th 170, 182 [necessary element of breach of fiduciary duty claim is the existence of a fiduciary

---

5       The cause of action for intentional interference in the second amended complaint also contains this allegation.

11

relationship].) Similarly, the duty to disclose element of Zamir's claim for fraud by concealment is predicated upon Mattern's purported agreement to represent Zamir. (See *Kaldenbach v. Mutual of Omaha Life Ins. Co.* (2009) 178 Cal.App.4th 830, 850 [one element of a cause of action for fraud based on concealment is defendant must have been under a duty to disclose fact to plaintiff]; accord, *Jones v. ConocoPhillips* (2011) 198 Cal.App.4th 1187, 1198.) Consequently, it, too, cannot stand.[6]

3. *The Second Amended Complaint Adequately Alleges a Cause of Action for Intentional Misrepresentation*

a. *Governing law*

Generally, "[a] fraud claim against a lawyer is no different from a fraud claim against anyone else. '"If an attorney commits actual fraud in his dealings with a third party, the fact he did so in the capacity of attorney for a client does not relieve him of liability."' [Citations.] While an attorney's professional duty of care extends only to his own client and intended beneficiaries of his legal work, the limitations on liability for negligence do not apply to liability for fraud. [Citation.] Accordingly, a lawyer communicating on behalf of a client with a nonclient may not knowingly make a false statement of material fact to the nonclient [citation] and may be liable to a nonclient for fraudulent statements made during business negotiations." (*Vega v. Jones, Day, Reavis & Pogue* (2004) 121 Cal.App.4th 282, 291 (*Vega*); see also *Favila v. Katten Muchin Rosenman LLP* (2010) 188 Cal.App.4th 189, 209 ["an attorney has 'an independent legal duty' not to defraud individuals engaged in business transactions with his or her client"]; *Shafer v. Berger, Kahn, Shafton, Moss, Figler, Simon & Gladstone* (2003)

---

[6]    Zamir has not suggested any credible way in which it could amend its complaint to avoid the problem of irreconcilable allegations in its earlier pleadings regarding Mattern's role in the transactions. Accordingly, the trial court properly sustained the demurrer to the legal malpractice, breach of fiduciary duty and concealment causes of action without leave to amend. (See *Schifando v. City of Los Angeles, supra*, 31 Cal.4th at p. 1081 ["[t]he plaintiff has the burden of proving that an amendment would cure the defect"]; see also *Lantzy v. Centex Homes* (2003) 31 Cal.4th 363, 386-387; *Goodman v. Kennedy* (1976) 18 Cal.3d 335, 349.)

107 Cal.App.4th 54, 84 [plaintiffs permitted to sue attorney for conspiring with insurance company to commit actual fraud because attorney "had a duty to refrain from injuring [plaintiffs] through express misrepresentation"].)

Fraud, however, "must be pled specifically; general and conclusory allegations do not suffice. [Citations.] 'Thus "'the policy of liberal construction of the pleadings . . . will not ordinarily be invoked to sustain a pleading defective in any material respect.'" [Citation.] [¶] This particularity requirement necessitates pleading *facts* which "show how, when, where, to whom, and by what means the representations were tendered."'" (*Lazar v. Superior Court* (1996) 12 Cal.4th 631, 645.) The elements of a fraudulent misrepresentation claim are "'(1) the defendant represented to the plaintiff that an important fact was true; (2) that representation was false; (3) the defendant knew that the representation was false when the defendant made it . . . ; (4) the defendant intended that the plaintiff rely on the representation; (5) the plaintiff reasonably relied on the representation; (6) the plaintiff was harmed; and (7) the plaintiff's reliance on the defendant's representation was a substantial factor in causing that harm to the plaintiff.'" (*Perlas v. GMAC Mortgage, LLC* (2010) 187 Cal.App.4th 429, 434, italics omitted; see *Robinson Helicopter Co., Inc. v. Dana Corp.* (2004) 34 Cal.4th 979, 991.)

b. *The cause of action is pleaded with sufficient specificity*

i. *The misrepresentations*

In support of its cause of action for intentional misrepresentation, Zamir alleged in the second amended complaint that Mattern made several misrepresentations "to induce [Zamir] to forbear enforcement of the Yomtoubian Defendants' obligation," including that Jack was a party to the promissory note and would be personally in breach of the agreement if weekly payments to Zamir were not made; and that the Laguna properties conveyed by quitclaim deeds transferred the property "free and clear" to Zamir, while, "[i]n reality, based on information and belief, Mattern intentionally included a description in the quitclaims of Real Property that did not and does not exist and is thus worthless." The general allegations, incorporated by reference into the fraud cause of action, supply more detail. For example, Mattern made the representations regarding the promissory

13

note to Hordishetz during a meeting on September 9, 2009 at Mattern's offices; and, based on those representations, Hordishetz signed the promissory note; Mattern made the representations regarding the Laguna properties during a meeting with Hordishetz at his offices on approximately August 2, 2011. Although ultimately the court or a trier of fact might find some of the alleged misrepresentations were more in the nature of nonactionable opinions rather than assertions of fact, there is no question Zamir has pleaded facts demonstrating how, when, where, to whom and by what means the alleged misrepresentations were made.

ii. *Actual reliance*

Mattern's contention Zamir failed to sufficiently allege it detrimentally relied on Mattern's misrepresentations is without merit. "'"[A]ctual reliance occurs when a misrepresentation is '"an immediate cause of [a plaintiff's] conduct, which alters his legal relations,"' and when, absent such representation," the plaintiff' 'would not, in all reasonable probability, have entered into the contract or other transaction.'"' [Citation.] To allege actual reliance with the requisite specificity, '[t]he plaintiff must plead that he believed the representations to be true . . . and that in reliance thereon (or induced thereby) he entered into the transaction.'" (*Beckwith v. Dahl* (2012) 205 Cal.App.4th 1039, 1062-1063.) The second amended complaint satisfies that requirement. In addition to alleging Zamir was ignorant of the true facts, the pleading asserts, "[Zamir] relied on Defendants' misrepresentations and concealments to its detriment in that [Zamir] entered into the Agreements and refrained from enforcing the Yomtoubian Defendants' obligation and filing a lawsuit. Zamir further continued to sell diamonds to the Yomtoubian Defendants (without getting paid) and it refrained from seizing its unpaid diamonds. Plaintiff was further required to obtain interest bearing loans and sustained substantial economic loss due to the Yomtoubian Defendants' failure to pay all monies due."

iii. *Justifiable reliance*

"In addition to pleading actual reliance, the plaintiff must set 'forth facts to show that his or her actual reliance on the representations was justifiable, so that the cause of

14

the damage was the defendant's wrong and not the plaintiff's fault.' [Citation.] There must be more pled than a simple statement plaintiff justifiably relied on the statements. [Citation.] The complaint must contain 'allegations of facts showing that the actual inducement of plaintiffs . . . was justifiable or reasonable.'" (*Beckwith v. Dahl*, *supra*, 205 Cal.App.4th at pp. 1066-1067.) Although we hold Zamir has failed to sufficiently allege it had an attorney-client relationship with Mattern, the facts we do not disregard as sham pleading are nevertheless sufficient, if believed by a jury, to a support a finding of justifiable reliance. At a minimum, Mattern made representations and explained legal documents to Hordishetz, who was not fluent in English and unrepresented by counsel. Hordishetz believed Mattern was trustworthy because his close friend (and Mattern's wife) Flor (and/or Jack) had assured him Mattern was honest and trustworthy and would assist in Zamir's collection efforts. Whether Zamir's reliance on representations that were contrary to the terms of the written instruments themselves was justifiable is a question for the trier of fact.

4. *The Second Amended Complaint Adequately Alleges a Cause of Action for Negligent Misrepresentation*

To recover on a claim for negligent misrepresentation, a plaintiff need not prove the party making the misstatement knew it was false; it is sufficient if the alleged tortfeasor had no reasonable grounds for believing it to be true. (*Conroy v. Regents of University of California* (2009) 45 Cal.4th 1244, 1255; *Roberts v. Ball, Hunt, Hart, Brown & Baerwitz* (1976) 57 Cal.App.3d 104, 110.) The second amended complaint adequately alleges, even if not intentional, Mattern's misstatements regarding, among other things, Zamir's rights under the promissory note and the status of title to the Laguna properties were negligently made—that is, that he had no reasonable grounds for making the misrepresentations identified.

Other than contending Zamir's claim for negligent misrepresentation fails for the same reasons as its claim for intentional misrepresentation—arguments that we have explained are without merit—Mattern asserts the authority relied upon by Zamir does not support its contention an attorney can be liable to parties adverse to his or her client for

negligent misrepresentation. Although Mattern is correct the cases cited by Zamir do not involve claims for negligent misrepresentation, he is wrong a cause of action for negligent misrepresentation cannot be asserted against an attorney by a third party under the circumstances alleged in the second amended complaint. In *Bily v. Arthur Young & Co.* (1992) 3 Cal.4th 370, adopting Restatement Second of Torts section 522, the Supreme Court held auditors may "be held liable for negligent misrepresentations in an audit report to those persons who act in reliance upon those misrepresentations in a transaction which the auditor intended to influence." (*Bily*, at p. 376.) The Court observed, however, that accountants are not the only "suppliers of information" who are potentially responsible for negligently made misstatements to individuals other than their clients: "Accountants are not unique in their position as suppliers of information and evaluations for the use and benefit of others. Other professionals, including attorneys, architects, engineers, title insurers and abstractors, and others also perform that function. And, like auditors, these professionals may also face suits by third persons claiming reliance on information and opinions generated in a professional capacity." (*Id.* at p. 410; see *B.L.M. v. Sabo & Deitsch* (1997) 55 Cal.App.4th 823, 834-835 [applying *Bily* to determine whether complaint by developer against law firm retained by city as bond counsel for proposed project adequately stated negligent misrepresentation claim; *Bily* had been decided between filing of complaint and motion for summary judgment]; *Soderberg v. McKinney* (1996) 44 Cal.App.4th 1760, 1768 [applying *Bily* to real estate appraisers].)

Although the second amended complaint in the instant action fails to adequately allege Zamir hired Mattern to represent it alone, or even jointly with the Yomtoubians, it properly alleges Zamir acted in reliance upon misrepresentations by Mattern in a transaction Mattern intended to influence. As the *Bily* Court explained to guide the trial courts, "Defendant is deemed to have intended to influence [its client's] transaction with plaintiff whenever defendant knows with substantial certainty that plaintiff, or the particular class of persons to which plaintiff belongs, will rely on representations in the course of the transaction." (*Bily v. Arthur Young & Co.*, *supra*, 3 Cal.4th at p. 414;

16

accord, *Public Employees' Retirement System v. Moody's Investors Service*, *Inc.* (2014) 226 Cal.App.4th 643, 668 & fn. 18 [applying *Bily's* objective standard "to ascertain whether a supplier of information has undertaken to inform and guide a third party with respect to an identified transaction" in case in which parties "accept[ed] that *Bily* controls on this issue, even though *Bily* involved an auditor rather than a rating agency"].) Satisfying that standard, the second amended complaint alleged Mattern knew Hordishetz was not fluent in English, explained the essential terms of the agreements to him, as well as advised him on ancillary matters, and intended Hordishetz would rely on Mattern's advice in deciding whether to sign the agreements and what course of action to take to collect the Yomtoubian's delinquent debt when they repeatedly failed to perform. It is, of course, a question for the trier of fact whether Mattern actually made those statements and, if so, whether Zamir's reliance on them was justifiable or reasonable under the circumstances.

5. *Because Mattern Was Acting as DJM's Agent, Zamir Cannot State a Cause of Action for Intentional Interference with Contractual Relations*

The elements of a claim for intentional interference with contractual relations are "'a valid contract between the plaintiff and a third party; [] defendant's knowledge of this contract; [] defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; [] actual breach or disruption of the contractual relationship; and [] resulting damage.'" (*Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 55.) "'[I]t is not necessary that the defendant's conduct be wrongful apart from the interference with the contract itself. [Citation.] [¶] . . . Intentionally inducing or causing a breach of an existing contract is . . . a wrong in and of itself. . . .'" (*Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1158.) Tracking these elements, the second amended complaint alleges Mattern (as well as the Yomtoubians) engaged in intentional acts designed to induce a breach of the promissory note between Zamir and DJM, including advising the Yomtoubians to form Diamond Jewelry Mart and to transfer all of DJM's assets to it to defraud creditors such as Zamir and the plaintiffs in the Camellia lawsuit.

17

Disregarding Zamir's sham allegations it, not the Yomtoubians or their affiliated business entities, was Mattern's client, Zamir's cause of action for intentional interference with contractual relations must fail. "It is axiomatic . . . that there can be no action for inducement of breach of contract against the other party to the contract. [Citation.] It is also well established that corporate agents and employees acting for and on behalf of a corporation cannot be held liable for inducing a breach of the corporation's contract." (*Shoemaker v. Myers* (1990) 52 Cal.3d 1, 24; accord, *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 513 ["[t]he tort duty not to interfere with the contract falls only on strangers—interlopers who have no legitimate interest in the scope or course of the contract's performance"]; *Mintz v. Blue Cross of California* (2009) 172 Cal.App.4th 1594, 1604 [as agent for health insurance plan, claims administrator could not be held liable for interference with contract it was administering]; cf. *Schick v. Lerner* (1987) 193 Cal.App.3d 1321, 1329 ["absent extraordinary circumstances, an attorney may not be held liable for urging a client to breach a contract with some third party"].) Because Mattern was DJM's agent, Zamir cannot state a cause of action against Mattern for interference with the promissory note between it and DJM.

6. *Zamir Cannot State a Cause of Action for Fraudulent Transfer*

a. *No direct claim is viable because Mattern was not the debtor*

"The [Uniform Fraudulent Transfer Act (UFTA), Civ. Code, § 3439 et seq.,] permits defrauded creditors to reach property in the hands of a transferee." (*Mejia v. Reed* (2003) 31 Cal.4th 657, 663.) "A fraudulent conveyance is a transfer by the debtor of property to a third person undertaken with the intent to prevent a creditor from reaching that interest to satisfy its claim." (*Yaesu Electronics Corp. v. Tamura* (1994) 28 Cal.App.4th 8, 13.) The purpose of the fraudulent transfer statute is "'to prevent debtors from placing property which legitimately should be available for the satisfaction of demands of creditors beyond their reach . . . .'" (*Chichester v. Mason* (1941) 43 Cal.App.2d 577, 584.)

The elements of a fraudulent conveyance are set forth in Civil Code section 3439.04, subdivision (a): "A transfer made or obligation incurred by a debtor is

18

fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation as follows: [¶] (1) With actual intent to hinder, delay, or defraud any creditor of the debtor. [¶] (2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor either: [¶] (A) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction. [¶] (B) Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due." Civil Code section 3439.04, subdivision (b), lists other factors to be considered in determining intent, including "[w]hether the transfer was of substantially all the debtor's assets" and "[w]hether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred." A creditor who has been damaged by a fraudulent transfer can set the transfer aside or seek other appropriate relief under Civil Code section 3439.07. (*Monastra v. Konica Business Machines, U.S.A., Inc.* (1996) 43 Cal.App.4th 1628, 1635-1636.)

Like the cause of action for intentional interference with contractual relations, the basis of the fraudulent conveyance claim against Mattern is that he advised and counseled "DJM and the Yomtoubians to drain the assets of DJM" by forming Diamond Jewelry Mart, transferring all of DJM's assets to it, as well as to the Yomtoubians personally and an additional business entity (Perris Commercial Center, Inc.), and labeling DJM's safes as "Diamond Jewelry Mart" so the contents could not be seized to satisfy a judgment against DJM. Mattern, however, was not the debtor and thus Zamir cannot state a direct cause of action against him for fraudulent conveyance. (See Civ. Code, § 3439.01, subd. (e) [debtor is defined as "a person who is liable on a claim"].)

> b. *No claim for conspiracy can be alleged because Mattern was acting as DJM's agent*

The question, then, is whether the second amended complaint alleges facts sufficient to sustain a claim against Mattern for conspiring to engage in fraudulent

19

transfers with the Yomtoubians. (See *Monastra v. Konica Business Machines, U.S.A., Inc.*, *supra*, 43 Cal.App.4th at p. 1645 [sufficient evidence from which trier of fact could find defendants who assisted debtor in making fraudulent transfers and concealing them were liable for conspiracy]; *Taylor v. S & M Lamp Co.* (1961) 190 Cal.App.2d 700, 706 ["a debtor and those who conspire with him to conceal his assets for the purpose of defrauding creditors are guilty of committing a tort and each is liable in damages."].) "Conspiracy is not a cause of action, but a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration. [Citation.] By participation in a civil conspiracy, a coconspirator effectively adopts as his or her own the torts of other coconspirators within the ambit of the conspiracy." (*Applied Equipment Corp. v. Litton Saudi Arabia Ltd.*, *supra*, 7 Cal.4th at pp. 510-511; see *Favila v. Katten Muchin Rosenman LLP*, *supra*, 188 Cal.App.4th at p. 206.)

As discussed, corporate agents acting for and on behalf of a corporation cannot be held liable for inducing a breach of the corporation's contract—"""being in a confidential relationship to the corporation their action in this respect is privileged.""" (*Doctors' Co. v. Superior Court* (1989) 49 Cal.3d 39, 45.) This principle animates the rule that agents of a corporation also "'cannot conspire with their corporate principal or employer where they act in their official capacities on behalf of the corporation and not as individuals for their individual advantage.'" (*Ibid.*; see *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.*, *supra*, 7 Cal.4th at p. 511 ["tort liability arising from conspiracy presupposes that the coconspirator is legally capable of committing the tort, i.e., that he or she owes a duty to plaintiff recognized by law and potentially subject to liability for breach of that duty"].) Because Mattern was acting as an agent for the Yomtoubians, Zamir cannot state a cause of action for conspiracy based on the alleged scheme to fraudulently transfer DJM's assets to the Yomtoubians personally and other business entities they had formed.

20

**DISPOSITION**

The order dismissing the action is reversed. On remand the trial court is directed to vacate its order sustaining the demurrer to the entire second amended complaint without leave to amend, to enter a new order sustaining the demurrer without leave to amend to the causes of action for legal malpractice, breach of fiduciary duty, fraud by concealment, fraudulent transfer and intentional interference with contractual relations, to overrule the demurrer to the intentional and negligent misrepresentation causes of action and to conduct further proceedings consistent with this opinion. The parties are to bear their own costs on appeal.

PERLUSS, P. J.

We concur:

ZELON, J.

SEGAL, J.

21