Filed 12/14/21  Odyssey Engineering v. Longo CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| ODYSSEY ENGINEERING Inc., et. al., | |
| Plaintiffs and Appellants, | G059242 |
| v. | (Super. Ct. No. 30-2018-01038748) |
| VINCENT LONGO et. al., | O P I N I O N |
| Defendants and Respondents. | |

Appeal from an order of the Superior Court of Orange County, Craig Griffin, Judge.  Affirmed.  Motion to supplement record denied.

Dracup & Patterson, Jeffrey A. Dracup and Terry Bell for Plaintiffs and Appellants.

Ropers Majeski, Andrew S. Hollins, Ethan A. Reimers; Messner Reeves and Andrew S. Hollins for Defendants and Respondents Vincent Longo, Wesrae Holdings, Inc., and Alex Marinescu.

Loeb & Loeb, W. Allan Edmiston and Saul D. Brenner for Respondents Stradling Yocca Carlson & Rauth and Mark Skaist.

*    *    *

Anthony Longo, Teresa Longo, and their company Odyssey Engineering Inc, (collectively Odyssey) appeal from an order denying their petition to vacate an arbitrator's dismissal of their case against the law firm of Stradling Yocca Carlson & Rauth, P.C. and one of its attorneys, Mark Skaist (collectively Stradling).

Odyssey argues the dismissal order should be vacated for two reasons. First, because the decision to dismiss the case against Stradling, rather than issue a stay that would preserve Odyssey's right to develop additional evidence, amounted to an improper refusal to hear evidence material to the controversy as set forth in Code of Civil Procedure section 1286.2, subdivision (a)(5).[1] And second, because the arbitrator, retired Superior Court Judge Gail Andler, failed to disclose that her "economic interest" in the ADR provider, JAMS, was an ownership interest—which in the circumstances of this case amounted to a ground for disqualification as set forth in section 1284.6, subdivision (a)(6).

Odyssey has also moved to supplement the record by asking to unredact a document it agreed to submit to the trial court in redacted form. Odyssey filed its motion to supplement after the respondents filed their briefs arguing that the lack of evidence establishing the extent to which any respondent or its counsel has done business with JAMS undermines Odyssey's position on the disqualification issue.

We deny Odyssey's motion to supplement the record. Our review is of the trial court's decision, and except in extraordinary circumstances, appellate rules require that our decision be based on the same evidence considered by the trial court.

---

[1] All further statutory references are to this code.

"'It is an elementary rule of appellate procedure that, when reviewing the correctness of a trial court's judgment, an appellate court will consider only matters which were part of the record at the time the judgment was entered. [Citation.] This rule preserves an orderly system of [litigation] by preventing litigants from circumventing the normal sequence of litigation.'" (*Haworth v. Superior Court* (2010) 50 Cal.4th 372, 379, fn. 2 (*Haworth*); *People v. Brooks* (1980) 26 Cal.3d 471, 484 ["Augmentation is not available . . . for the purpose of adding material that was not a proper part of the record in the trial court"].) A request to augment after the opposing parties have filed their briefs is also untimely. (*People v. Preslie* (1977) 70 Cal.App.3d 486, 492 [requests for augmentation of the record "made after a reasonable time has expired from receiving the record on appeal, and particularly as late as those contained in briefs, will be denied absent a strong showing of unusual or unavoidable circumstances giving rise to the delay"].)

Here, Odyssey does not contend the omitted evidence was unavailable to it during the trial court proceedings, only that it apparently considered the evidence unnecessary until it reviewed the respondents' briefs on appeal. Those are not the extraordinary circumstances that will justify augmentation of the record.

We reject Odyssey's substantive arguments as well. The arbitrator considered Odyssey's evidence and arguments in opposition to Stradling's motion to dismiss before ruling on its merits. The fact that her ruling may have been legally incorrect is not a basis to vacate the ruling under section 1286.2, subdivision (a)(5), even if its effect was to limit the issues or evidence in the arbitration.

And the fact that an arbitrator's disclosed financial interest in JAMS was based on an ownership stake, rather than a profit sharing or other interest in the company, is not a ground for disqualification under section 1286.2, subdivision (a)(6). Even if it were, Odyssey was free to seek additional information about the nature of the arbitrator's economic interest at the time it was disclosed; its failure to do so forfeited the issue.

The order is affirmed.

3

**FACTS**

Odyssey became embroiled in a dispute with Anthony Longo's brother, Vincent Longo, and his company, Wesrae Holdings, Inc. (collectively Wesrae), over allegations that Wesrae had embezzled funds from a third company, Futures Fins, LLC (Futures), which is jointly owned by Odyssey and Wesrae. Odyssey also claimed that Stradling, in its capacity as Futures's legal counsel, aided and abetted Wesrae's embezzlement.

Odyssey initiated a private arbitration of the dispute against both Wesrae and Stradling through ADR provider JAMS.[2] In April 2019, the JAMS arbitrator selected by the parties provided them with her initial disclosures, including that, within the preceding five years, she had served as a neutral arbitrator in other matters involving a party, a lawyer for a party, or law firm for a party to the current arbitration. At the same time, JAMS provided the parties with reports listing the arbitration matters handled by the arbitrator within the last five years (and mediation matters handled within the past two years) that included any party or any lawyer or law firm representing a party to the present arbitration.

JAMS's April disclosures also informed the parties that the arbitrator "practices in association with JAMS. Each JAMS neutral, including the neutral in this case, has an economic interest in the overall financial success of JAMS. In addition, because of the nature and size of JAMS, the parties should assume that one or more of the other neutrals who practice with JAMS has participated in an arbitration, mediation or other dispute resolution proceeding with the parties, counsel or insurers in this case and may do so in the future." In connection with those disclosures, the parties were invited to make further inquiries related to them.

---

[2]     Odyssey also asserted a claim against Alex Marinescu, who is alleged to have aided and abetted Wesrae's misconduct.

4

In July 2019, Stradling moved to dismiss the claim against it, relying on *McDermott, Will & Emery v. Superior Court* (2000) 83 Cal.App.4th 378 for the proposition that dismissal is proper in cases where a law firm is unable to meaningfully defend itself due to the strictures of the attorney client privilege. In its opposition, Odyssey relied on *Favila v. Katten Muchin Rosenman LLP* (2010) 188 Cal.App.4th 189 (*Favila*), to argue the court should stay the action rather than dismiss it because there was a realistic possibility that further litigation would result in either a waiver of the privilege or the discovery of evidence supporting an exception to it. In a decision that explained at some length why she concluded *Favila* was inapposite, the arbitrator granted Stradling's motion to dismiss.

Approximately two months after the arbitrator's ruling, the Ninth Circuit Court of Appeals issued a decision, *Monster Energy Co. v. City Beverages, LLC*, 940 F.3d 1130 (9th Cir. 2019) ("*Monster Energy*"), which vacated an arbitration decision on the basis that a JAMS arbitrator had failed to disclose (1) that he had an ownership interest in JAMS, and (2) that one of the parties to the case had a substantial, ongoing business relationship with JAMS.

Apparently in response to the *Monster Energy* decision, the arbitrator in this case issued an additional disclosure in November 2019 stating she had "an equal share ownership interest" in JAMS, that she had "never received a profit distribution of more than .1% of JAMS total revenue in a given year," and that she was "not privy to information regarding the number of cases or revenue related to cases assigned to other panelists."

Also, in November 2019, JAMS sent the parties supplemental information regarding JAMS and its cases. The report identified the number of cases that JAMS— broadly defined to include all JAMS neutrals in all the company's offices—had administered during the preceding five years that had involved a "party, lawyer, or law firm in the present case." The numbers revealed in the report were redacted in the trial

court filing and are not included in the record before us. This is the information appellants now ask us to consider.

The materials provided to the parties in November 2019 also noted that "JAMS administers approximately 13,000 cases per year," and further stated "JAMS has approximately 400 neutrals on its panel, and a little over one quarter of JAMS neutrals have an equal ownership share in the company. Owners are not privy to information regarding the number of cases or revenue related to cases assigned to other panelists. No shareholder's distribution has ever exceeded 0.1% of JAMS total revenue in a given year. Shareholders are not informed about how their profit distributions are impacted by any particular client, lawyer or law firm and shareholders do not receive credit for the creation or retention of client relationships." The report also informed the parties that "[t]his report is not provided to JAMS neutrals and will not be provided to the neutral in this matter."

Based upon the arbitrator's additional disclosure, Odyssey submitted a request to JAMS to disqualify Judge Andler as the case neutral and "restart the arbitration with a neutral arbitrator who holds no JAMS ownership." It then filed a challenge for cause. JAMS denied both the request and the challenge. Odyssey also submitted a request directly to Judge Andler that she disqualify herself. She declined.

In December 2019, Odyssey filed a petition to vacate the arbitration decision dismissing Stradling, pursuant to section 1284.2. As grounds for the petition, Odyssey claimed (1) the arbitrator engaged in misconduct that substantially prejudiced its rights; (2) the arbitrator unfairly refused to postpone the hearing or hear evidence to settle the dispute; and (3) the arbitrator failed to disclose within the time for disclosure a ground for disqualification of which the arbitrator was then aware.

In support of the disqualification argument, Odyssey's counsel declared that "[f]ollowing the November 1, 2019 disclosure of Judge Andler's ownership in JAMS, Claimants, by their legal counsel, timely filed a challenge to the continued service

6

of arbitrator Andler in this matter . . . . [¶] Had this critical disclosure been made at the initial disclosure, I would have demanded JAMS provide the case load given to JAMS by Stradling. Seeing the case load Stradling provides to JAMS, (as JAMS disclosed on November 12, 2019), I would have moved to disqualify Judge Andler not only on the automatic disqualification permitted by Code Civ. Proc. § 1281.91 but based on the large firm bias her ownership in JAMS brings to this arbitration."

Odyssey then filed a motion to disqualify Judge Andler from further participation in the case concurrently with its petition to vacate the contractual arbitration award.

Stradling and Wesrae opposed the petition and motion, arguing the arbitrator had sufficiently disclosed her financial interest in the economic success of JAMS and that Odyssey waived any objection by failing to make a timely inquiry about the issue. They also claimed Odyssey was belatedly raising the issue solely because it disagreed with her ruling.

The trial court denied the petition and denied the motion to disqualify the arbitrator.

## DISCUSSION

1. *Governing Principles*

Odyssey seeks to vacate a binding arbitration award. Section 1286.2 allows the courts to vacate such awards only in very limited circumstances because "it is the general rule that parties to a private arbitration impliedly agree that the arbitrator's decision will be both binding and final." (*Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 9.)

As explained by our Supreme Court, "Most legal errors in arbitration are not reviewable. [Citations.] An award may be vacated only for fraud, corruption, misconduct, an undisclosed conflict, or similar "circumstances involving serious

7

problems with the award itself, or with the fairness of the arbitration process." [Citation.] Otherwise, judicial corrections are limited to remedying 'obvious and easily correctable mistake[s]' 'technical problem[s],' and actions in excess of authority so long as the correction leaves the merits of the decision unaffected. [Citation.] '[B]y voluntarily submitting to arbitration, the parties have agreed to bear the risk [of uncorrectable legal or factual error] in return for a quick, inexpensive, and conclusive resolution to their dispute.'" (*Heimlich v. Shivji* (2019) 7 Cal.5th 350, 367, fn. omitted (*Heimlich*).)

2. *Arbitrator's Failure to Allow Odyssey to Present Its Case Against Stradling*

One of the limited grounds for vacating an arbitration award is that the arbitrator prevented a party from fairly presenting its case. (§ 1286.2, subd. (a)(5) (subdivision (a)(5)) ["[t]he rights of the party were substantially prejudiced by . . . the refusal of the arbitrators to hear evidence material to the controversy"].)

Odyssey argues the arbitrator in this case improperly refused to hear material evidence because she erroneously granted a request for dismissal by Stradling, rather than conditionally staying the proceeding against it pursuant to *Favila*, as advocated by Odyssey. Odyssey argues that ruling is reviewable under subdivision (a)(5) because its effect was to unfairly deny Odyssey the opportunity to present material evidence it hoped to later develop in support of maintaining its claim for damages against Stradling.

We disagree. As explained by our Supreme Court in *Heimlich*, subdivision (a)(5) cannot be spun into a justification for reviewing the merits of an arbitrator's ruling, even in cases where the ruling had the effect of eliminating a party's claim. In *Heimlich*, the arbitrator concluded—incorrectly as it turns out—that he lacked jurisdiction to award costs. Although the appellant argued the award could be vacated under subdivision (a)(5) because the erroneous ruling amounted to an unfair refusal to consider his evidence of costs, the Supreme Court concluded "[t]his analysis fails." (*Heimlich, supra,* 7 Cal.5th at p. 368.)

8

As the Supreme Court pointed out, "[t]he provision is not 'a back door to *Moncharsh* through which parties may routinely test the validity of legal theories of arbitrators.' [Citation.] Instead, it was designed as a 'safety valve in private arbitration that permits a court to intercede when an arbitrator has prevented a party from fairly presenting its case.' [Citation.] It comes into play, for example, when an arbitrator, without justification, permits only one side to present evidence on a disputed material issue. . . . [Citation.] . . . To conduct an arbitration without abiding by that principle evinces bias, constituting misconduct. [¶] . . . [¶] In contrast, *section 1286.2, subdivision (a)(5) does not contemplate vacation of an award merely because arbitrators refuse to consider evidence they find legally irrelevant, even if the irrelevance determination rests upon an incorrect legal foundation.*" (*Heimlich, supra,* 7 Cal.5th at pp. 368-369, italics added.)

The Supreme Court then reached this conclusion: "There is a difference between a legal conclusion that jurisdiction is lacking and an arbitrary refusal to hear relevant evidence on an issue properly before the arbitrator. [The appellant's] complaint is with the underlying jurisdictional determination. Neither that determination nor the resulting refusal to consider evidence erroneously deemed irrelevant is misconduct under the evidentiary prong of section 1286.2, subdivision (a)(5)." (*Heimlich, supra,* 7 Cal.5th at p. 369.)

On a more practical level, the Supreme Court observed that "[t]o allow an arbitration award to be set aside under section 1286.2, subdivision (a)(5), whenever an erroneous legal ruling results in the exclusion of evidence deemed important would undermine a foundation of the Arbitration Act, that an arbitrator's legal error ordinarily is not judicially reviewable." (*Heimlich, supra,* 7 Cal.5th. at p. 370.)

This case cannot be materially distinguished from *Heimlich*. The arbitrator here considered Odyssey's opposition to Stradling's motion, and she explained in some

9

detail why she disagreed with Odyssey's assertion that *Favila* justified a stay, rather than an outright dismissal, of its claim against Stradling.

Odyssey's complaint is that the arbitrator "failed to apply *Favila* properly," not that the arbitrator reached her decision in a procedurally unfair manner. It may be true that the arbitrator erred in her analysis of *Favila*, but for purposes of our review, it does not matter. Pursuant to *Heimlich*, Odyssey's complaint does not warrant vacation of the award under subdivision (a)(5).

    3.    *Arbitrator's Failure to Disclose Ownership Interest in JAMS*

Odyssey also argues the arbitrator's decision must be vacated under subdivision (a)(6) of section 1286.2 (subdivision (a)(6)) because the arbitrator failed to disclose that she had an ownership interest in JAMS. Relying on the Ninth Circuit decision in *Monster Energy*, Odyssey contends the arbitrator's ownership interest in the company would cause "a person aware of the facts to reasonably entertain a doubt that the proposed neutral arbitrator would be able to be impartial." (Quoting section 1281.9, subd. (a).)

In *Monster Energy*, the majority considered whether an arbitration award should be vacated because the arbitrator's disclosure of "'an economic interest in the overall financial success of JAMS'"—the same disclosure made in this case—was an insufficient disclosure of the arbitrator's *ownership* interest in the provider. (*Monster Energy, supra*, 940 F.3d. at pp. 1133-1134, 1136.) However, the *Monster Energy* majority analyzed that issue under the Federal Arbitration Act (FAA), rather than under section 1286.2. [3] The majority concluded that an arbitrator's ownership interest must be

---

[3]    The *Monster Energy* majority does acknowledge California's requirement that arbitrators disclose "'any known facts that a reasonable person would consider likely to affect the impartiality of the arbitrator'" (*Monster Energy, supra*, 940 F.3d at p. 1137), as an "example" of the disclosure rules enacted by "states within our circuit" (*id.* at p. 1136), but the case does not apply that standard.

10

disclosed in any case where a party has "nontrivial business dealings" with the provider. (*Id.* at p. 1136.)

The majority made clear that its conclusion was based in part on the need to ensure transparency in cases involving inexperienced litigants. Although it acknowledged that the participants in the arbitration before it were "sophisticated companies," the *Monster Energy* majority noted that arbitrations often involve "every day" disputes "including in employment-related disputes, consumer transactions, housing issues, and beyond [which] means that arbitration will often take place between unequal parties." (*Monster Energy, supra*, 940 F.3d. at p. 1137.) As a result, the majority reasoned the better rule would be to require more explicit disclosure when an arbitrator holds an ownership interest in the ADR provider.

However, as pointed out by another panel of this court in *Speier v. The Advantage Fund, LLC* (2021) 63 Cal.App.5th 134 (*Speier)*, the disclosure rules are more explicit and detailed under California law, and they distinguish between different types of cases. Thus, "in a consumer arbitration, the arbitrator must disclose '[a]ny significant past, present, or currently expected financial or professional relationship or affiliation between the administering dispute resolution provider organization and a party or lawyer in the arbitration.' In consumer arbitrations, standard 8(c) [of the California Rules of Court Ethics Standards for Neutral Arbitrators in Contractual Arbitration] further requires the arbitrator also to provide information regarding '[a]ny financial relationship or affiliation the arbitrator has with the provider organization other than receiving referrals of cases, including whether the arbitrator has a financial interest in the provider organization or is an employee of the provider organization.'" (*Speier, supra*, at p. 149, fn. omitted.)

*Speier* also notes the same rule states "'[a]n arbitrator is *not* required to make the disclosures required by this standard if he or she reasonably believes that the arbitration is not a consumer arbitration based on reasonable reliance on a consumer

11

party's representation that the arbitration is not a consumer arbitration.'" (*Speier, supra*, 63 Cal.App.5th at p. 149.)

Given California's more nuanced disclosure rules, we are not persuaded that *Monster Energy's* one-size-fits-all disclosure standard applies here. Instead, we concur with the analysis in *Speier*, which addressed the same disqualification argument made here by Odyssey, in essentially the same factual circumstances. After pointing out that under California law, an arbitrator in a commercial dispute is not required to disclose an ownership interest in the ADR provider, *Speier* considered whether such a disclosure was "nevertheless required because, under the specific facts and circumstances of this case, the information could reasonably raise a doubt in a person aware of the facts about the arbitrator's impartiality." (*Speier, supra,* 63 Cal.App.5th at p. 150; see § 170.1, subd. (a)(6)(A)(iii).)

*Speier* observed that "'"The 'reasonable person' is not someone who is 'hypersensitive or unduly suspicious,' but rather is a 'well-informed, thoughtful observer'"'" and that "'[t]he partisan litigant emotionally involved in the controversy underlying the lawsuit is not the *disinterested objective observer* whose doubts concerning the judge's impartiality provide the governing standard.'" (*Speier, supra*, 63 Cal.App.5th at p. 147.) The *Speier* panel then concluded that, because the parties' attorneys were from law firms that had identical numbers of cases before JAMS in the five-year period preceding the arbitration, the arbitrator's ownership interest in JAMS did not reasonably raise a doubt about the arbitrator's impartiality. (*Id.* at p. 150.)

This case is distinguishable from *Speier* in that we do not know the number of matters each side (including their respective counsel) has had before JAMS in the five years preceding the arbitration. But neither did the arbitrator. JAMS's disclosure made clear the total number of cases a particular party, attorney, or law firm brings to JAMS is not shared with its neutrals. Because the arbitrator had no knowledge of those case

12

numbers, we cannot see how they would be pertinent in assessing her impartiality in a particular case.[4]

Rather than arguing specific numbers, Odyssey relies on the assertion that Stradling itself is a large law firm, and both Stradling and Wesrae were represented by other large law firms, while Odyssey is represented by a small law firm.[5] According to Odyssey, these "'BigLaw'" firms would naturally be viewed as "'"a source or potential source of . . . additional income, for the arbitrator"'"" based upon her ownership interest in JAMS, and thus a reasonable person would consider that ownership interest to be a reason to doubt her impartiality.

What Odyssey's argument ignores is the fact that prior to this arbitration, JAMS had disclosed to the parties that "*[e]ach JAMS neutral, including the neutral in this case, has an economic interest in the overall financial success of JAMS*" (original italics). The disclosure did not use the word "ownership," but it conveyed that the individual neutrals would somehow share in JAMS's "financial success"; it thus suggested that if JAMS did well financially so too would they. Given that disclosure, we see little difference between an "economic interest" and an "ownership interest," as either might raise some concern about an arbitrator's impartiality.

The dissenting judge in *Monster Energy* made a similar point: "The majority reasons . . . that the Arbitrator's interest as a JAMS owner should have been

---

[4] *Monster Energy* is distinguishable on this point. In that case, Monster (a large soft drink company) had inserted a provision in its form franchise agreements that required any disputes to be arbitrated by JAMS in its Orange County, California, location. (*Monster Energy, supra*, 940 F.3d at p. 1136.) That arbitration provision would suggest to any individual arbitrator handling one of the Monster cases that Monster was responsible for providing a steady stream of business to JAMS's Orange County office.

[5] Wesrae argues that Odyssey's characterization of the size of these law firms is not supported by evidence in the record. The point is well-taken, but we will assume, for purposes of evaluating the argument, that they are among the many large law firms that utilize the services of ADR providers, including JAMS.

specifically disclosed because it 'greatly exceeds the general economic interest that all JAMS neutrals naturally have in the organization.' [Citation.] I do not see how this information would have made a material difference in Olympic Eagle's evaluation of the Arbitrator. Owners of JAMS have an interest in maximizing JAMS's amount of business, because they share in JAMS's profits. Likewise, non-owner arbitrators have an interest in advancing their professional careers and maintaining their status with JAMS, which creates similar incentives to decide cases in a way that is acceptable to repeat player customers—otherwise, JAMS might terminate the non-owner's JAMS affiliation. [¶] . . . Because both types of arbitrators would have at least some incentive to keep repeat customers of JAMS such as Monster happy, it is unclear why knowing the details of the financial relationship between any specific potential arbitrator and JAMS would make a material difference . . . . That an arbitrator has an ownership interest in the arbitration firm, not just a financial interest in that firm more generally, is hardly the sort of 'real' and 'not trivial' undisclosed conflict that our court has held requires vacatur." (*Monster Energy*, *supra*, 940 F.3d at pp. 1140-1141 (dis. opn. of Friedland, J.).)[6]

_____

[6] The *Monster Energy* majority notes that while JAMS' initial disclosure revealed that all JAMS neutrals have an "economic interest" in the company's financial success, only about one-third of those neutrals actually have an ownership interest in the company. (*Monster Energy*, *supra*, 940 F.3d. at p. 1136, fn. 2.) Based on that difference, the majority seems to assume, without explanation, that the initial "economic interest" disclosure made by JAMS refers only to "the general economic interest that all JAMS neutrals naturally have in the organization," while the undisclosed ownership interest of some neutrals "greatly exceeds" that general interest. (*Ibid.*) We find this reasoning difficult to follow. There are various ways in which a neutral could directly share in JAMS's financial success—e.g., a profit-sharing agreement—that are distinct from an ownership interest. And a significant profit-sharing agreement could be even more lucrative than a small ownership interest. We assume JAMS's initial disclosure was intended to put the parties on notice that a potential arbitrator had some sort of financial stake in the success of the company; the disclosure then left it to the parties to decide whether further inquiry on the subject was required.

We believe the initial JAMS disclosure, which informed the parties that each of its neutrals has an "economic interest" in the financial success of the entity overall, was sufficient to trigger an obligation in any party to seek clarification if the issue raised a concern. (See *Dornbirer v. Kaiser Foundation Health Plan, Inc.* (2008) 166 Cal.App.4th 831, 841 (*Dornbirer*) ["although Adelman's disclosure letter may be ambiguous with regard to the precise number of cases he had previously arbitrated in which Kaiser was a party, the disclosure was sufficient to put Dornbirer on notice that Adelman had served as an arbitrator in a large number of such cases. If Dornbirer was concerned about the number of times Adelman had served as an arbitrator for Kaiser, she had the opportunity to ask for clarification"].)

A party cannot ignore an issue that is disclosed by the arbitrator before the arbitration, and later seek to overturn the result based on that same issue. As stated in *Dornbirer*, a party's remedy when an arbitrator has failed to make required disclosures under section 1281.9, or has made incomplete disclosures, is to seek disqualification under section 1281.91, subdivision (a), before the arbitration takes place.[7] (*Dornbirer, supra,* 166 Cal.App.4th at p. 846.) A party's failure to do so results in a forfeiture of the right to disqualify the arbitrator.[8] (§ 1281.91, subd. (c).)

Odyssey argues that it did in fact challenge Judge Andler as soon as it could after JAMS provided its "ownership interest" disclosure in November 2019, and that this

---

[7]     Section 1281.91, subdivision (a), states: "A proposed neutral arbitrator shall be disqualified if he or she fails to comply with Section 1281.9 and any party entitled to receive the disclosure serves a notice of disqualification within 15 calendar days after the proposed nominee or appointee fails to comply with Section 1281.9."

[8]     Section 1281.91, subdivision (c), states in pertinent part: "The right of a party to disqualify a proposed neutral arbitrator pursuant to this section shall be waived if the party fails to serve the notice pursuant to the times set forth in this section, unless the proposed nominee or appointee makes a material omission or material misrepresentation in his or her disclosure."

15

challenge satisfied the requirements of section 1281.91.  We are not persuaded.  Odyssey was on notice well before the arbitration commenced of Judge Andler's "financial interest" in JAMS.  As discussed in *Dornbirer*, once Odyssey became aware of the arbitrator's economic interest in JAMS, it had an obligation to either make further inquiry about the subject or proceed with the arbitration and accept its outcome.

## DISPOSITION

The order is affirmed.  Stradling is entitled to its costs on appeal.

GOETHALS, J.

WE CONCUR:

O'LEARY, P. J.

MARKS, J.*

*Judge of the Orange County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

16